HANNAH T. WHITE *et al. v.* HENRY W. HICKS, surviving Ex'r, &c., of SAM'L HICKS, dec'd, *et al.*

A person entitled, under a power of appointment, to dispose of property by deed or will, may make such disposition by a proper instrument, without inserting in it a reference to the power, if it otherwise appear that the intention was to execute the power.

But where the disposition was by will, *held*, that a parol declaration, by the testator, of an intention· to execute the power, was not competent evidence of such intention.

It is, however, competent for the court to compare the dispositions of the will with the testator's own property, and to deduce therefrom an intention to embrace in his testamentary gifts the subject he was entitled by the power to dispose of.

Accordingly, where a married woman had power, under the will of her father, to dispose by will of the principal of a sum of $50,000, the interest of which was given to her for life, to her husband or otherwise, and she made her will, without referring to the power, by which she bequeathed to her husband $50,000, and to other legatees pecuniary legacies amounting to $32,000, and a general residue, and it appeared that her own property amounted to only $54,000, and that she well knew the amount of her estate, and executed the will when she knew herself to be *in extremis;* held, that the power to dispose of the $50,000 was validly executed by the gift of $50,000 to her husband.

The English cases, decided since the American revolution, by which it was established that the amount of the testator's property could not be inquired into to show an intention to execute a power of appointment, are not to be followed in this State, especially as the rule has been disapproved of by English judges, and has recently been abrogated by act of parliament.

APPEAL from a judgment of the Supreme Court.

The action was brought to recover legacies bequeathed to the plaintiffs by the last will and testament of Eliza H. H. Rieben, deceased. The only question presented relates to a legacy of $50,000 to Pierre Rieben, the husband of the testatrix; and the right to recover that sum depends upon the question whether the will was a valid appointment of that amount, under a power contained in the will of her father, Samuel Hicks. The facts are as follows: Samuel Hicks died in November, 1837, having in the preceding month made his last will and testament, by which he gave to his daughter, then Eliza H. Hicks, his household furniture, horses, carriages

and harnesses, absolutely. He also devised to her, for life, the house No. 245 Broadway, New York, in which he lived, and the stable attached to it, the remainder to belong to the residue of his estate. The will then proceeded as follows: "I also give and bequeath to my said executors, the sum of one hundred thousand dollars, in trust, to invest at as early a period after my decease as convenient, and keep the same invested as a distinct fund, in bonds and mortgages on property within this State, or, at least, to invest one-half of that amount, to wit, the sum of fifty thousand dollars, in that manner; and the other half, if they see fit not to invest the whole in bonds and mortgages as aforesaid, to invest in bank stock in the city of New York, or stock of the United States Bank, or stock of the State of New York, or of the United States, or of the corporation of the city of New York — and to receive the interest and dividends derivable from the whole fund, and pay the same over, as received, to my said daughter during her natural life; and my will is that, in the event of her marriage, said interest and dividends, and also the rents and profits of said house and stable, be paid to her, on her separate receipt as a voucher, and for her sole and separate use and benefit, and free from the debts, control or interference of her husband; and upon the further trust on the death of my said daughter, to divide the whole of said fund of one hundred thousand dollars equally among her children then surviving her, and the children of any deceased child (such children of a deceased child to take the parent's share); and if she has no children or grandchildren living at the time of her death, then in trust to pay over one-half thereof to such person or persons, whether her husband (if she be married) or otherwise, as she may by last will and testament appoint; but the other half of said fund, it is my will shall become part of and go with the residue of my estate."

The residue of his estate, real and personal, he gave to his two sons, John H. and Henry W. Hicks; and he appointed them executors.

In 1847, Eliza H. Hicks intermarried with the plaintiff, Pierre Rieben; and on the 19th of May, 1855, she made her will, duly signed and attested, in the following words: -

"In this, my last will, I give to my husband, Pierre Rieben, fifty thousand dollars. To my aunt Hannah T. White, twenty thousand dollars, to buy a house. To my cousin, Samuel Hicks Seaman, five thousand dollars. To my cousin Maria T. Corlies, one thousand dollars. To Nancey Haff, one thousand dollars. To Luther Perry, of Rome, as a trifling return for his many acts of brotherly kindness, five thousand dollars. The remainder to be equally divided between my cousins, Elizabeth White, Sarah Hicks White, and Cornelia White. All my clothing, jewelry, books, papers and personal property contained in the Metropolitan Hotel, and No. 10 West Fourteenth street (the bureaux, boxes and trunks to be given unopened) to my cousins Elizabeth White and Sarah Hicks White, for their use and control. The paintings at No. 10 West Fourteenth street, I give to my brother Henry W. Hicks; the one at the Metropolitan Hotel, by L. Terry, to be given to any public institution he may choose to name.

"As my husband, Pierre Rieben, has been absent five weeks without being heard from, I wish advertisements to be inserted in the papers of the principal cities in the United States, and rewards offered, to ascertain his fate. If he should be deceased, of the fifty thousand dollars intended for him, I give ten thousand to his nephew, the son of his brother, John Rieben, of the Canton Berne, Switzerland; to my cousin Caroline Hicks Seaman, ten thousand dollars; to the children of my deceased cousin, John Hicks, of Westberry, ten thousand dollars; to John W. Haydock, ten thousand dollars; to my friend Mrs. Chapman, wife of the artist, at Rome, and formerly of Virginia, five thousand dollars; the remaining five thousand dollars, to my cousin Elizabeth White; providing nothing can be heard of my husband, Pierre Rieben; the fifty thousand dollars to be held in trust for his benefit, by Dr. John C. Cheeseman, Edward H. White and Henry W. Hicks, for ten years, and at the end of that time, if he should not return to claim it, to be divided as above named."

She died on the following day. There was no issue of her marriage. The defendants are the surviving executor

of the will of Samuel Hicks, and the executrix and execu-
tors of the will of John H. Hicks, deceased, who was the
other executor of Samuel, and one of his residuary legatees.
The defendants, by their answer, insisted that Mrs. Rieben
had not executed the power of appointment.

The case was tried before a justice of the Supreme Court,
without a jury, who came to the following conclusions of
fact: That besides the right to dispose of the sum of
$50,000, under the will of her father, the testatrix was
possessed of and entitled to the sum of $53,950, of which
$31,450 was the balance of the rents and profits of the house
No. 245 Broadway, and of interest on the $100,000, given to
her for life, over and above the sums which had been paid
to her, and of certain investments made for her benefit, which
investments were reckoned in making up the $53,950, and
she had besides, her clothing, jewelry and books, and the
articles specifically bequeathed by her will; that the $100,-
000 given for her use in her father's will, was not invested as
therein directed, but with the rents of the house, went into
the hands of a commercial firm, composed of the two exe-
cutors and another person, who charged themselves and
credited her with those rents, and the annual interest on
$100,000, and paid her drafts from time to time drawn
on them; that the testatrix, at the time of making her will,
and at her death, had no other estate or property than that
above mentioned; that although she had never seen the
accounts, she had been informed by her brother, H. W.
Hicks, one of the executors, of the amount of her income,
and when she made her will well knew the amount of the
accumulations and the extent of her estate, and was aware
of her right, under her father's will, to dispose, by her own
will, of the $50,000; that she was an invalid and in very
feeble health for the last twenty years of her life; that she
resided very much abroad, in France, and never pursued any
occupation, or had any means of subsistence except such as
arose out of the provisions made by her father's will; that
at the time of making her will she was in an extremely low
state of health and believed she could not recover, "and that

she was nigh unto death." The judge also found, as a conclusion of fact, that the testatrix intended, by her last will and testament, to exercise her power of appointment over the $50,000, for that purpose mentioned in the will of Samuel Hicks.

In matter of law, he decided that the power was lawfully executed, and he rendered judgment for the plaintiffs accordingly.

The evidence respecting the amount and circumstances of the testatrix's property, her mode of life and the circumstances of her death, was received against the objection of the defendants' counsel, who excepted to the decision. The judge also admitted, against the defendants' objection, evidence of the declarations of the testatrix at the time of making the will, tending to show that in giving the legacy of $50,000 to her husband, she intended to dispose of the $50,000 which by her father's will she was empowered to dispose of. Upon the subject of that evidence, the case contains the following statement: " The counsel for the defendants also objected to all evidence bearing on the condition of the testatrix at the time of making the will, and also to all evidence of extrinsic circumstances relating to the testatrix or her estate, it being agreed that the objection, and the ruling and exception, should apply to all such evidence when offered in the case, the same as if repeated and particularly made to every separate portion thereof, and that each and every part of the extrinsic evidence offered to show the testatrix's intent, or to aid in construing the will, should, at every stage of the case, be deemed to have been duly excepted to, and admitted under an exception by the defendants, so that every part of the same which was not admissible might be stricken out and wholly disregarded."

The judgment having been affirmed at a General Term, the defendants brought this appeal.

*J. H. Reynolds,* for the appellants.

*C. O'Conor,* for the respondents.

Denio, Ch. J. The evidence of the declarations of Mrs. Rieben, that she intended by her will to dispose of the

$50,000 which she had authority by her father's will to bequeath, was inadmissible upon the plainest principles. A will must be wholly in writing and cannot be added to or explained by any parol communications. If, therefore, the issues in this case had been tried by a jury, and there had been no agreement respecting the evidence, we should have been obliged to order a new trial on account of the erroneous rulings by which the incompetent evidence was received. But I am of opinion that the stipulation entered into by the counsel upon the trial, will permit us to sustain the judgment, if it can be supported upon the legal evidence and by rejecting that which was incompetent. It was agreed that so much of the evidence as was incompetent should be stricken out and wholly disregarded. It does not appear that any motion was subsequently made to strike out this evidence of declarations, or that the judge paid any regard to it in reaching his conclusions of fact. He found, it is true, that in point of fact, Mrs. Rieben intended to exercise her power of appointment; but it does not follow that he was influenced in so holding by the incompetent evidence. If there was no other sufficient evidence to lead to that conclusion, the judgment would have to be reversed; not on account of the erroneous ruling, but because the judgment could not stand upon the facts which were legally proved.

The question as to the competency of the evidence respecting the property of the testatrix, and her expectation of proximate death, on account of the state of her health, involves the whole merits of the case. If that evidence was not admissible there can be scarcely a pretense that the power of appointment was executed by the will of the testatrix. If, on the other hand, it was properly received, the question will be whether the state of facts which it established, taken in connection with the provisions of the instrument, are sufficient to show, clearly, that the testatrix, when she executed her will, had in her mind her power of appointment conferred by her father's will, and intended to act upon it in giving the $50,000 to her husband. The will makes no mention of the power. The dispositions are all such as

would be natural enough if the testatrix had, or supposed she possessed, an amount of money or convertible property equal to or exceeding the aggregate of the pecuniary legacies. There are, however, some features of the will which, taken in connection with the will of her father, would, of themselves, lead to a very plausible conjecture that she supposed herself acting under these provisions. She gave to Pierre Rieben a precise sum of $50,000, and this was the amount which, in addition to her own property, she was empowered to dispose of. He was her husband, and the power contained an intimation that that sum might be given as a provision for a husband, if she should be a married woman at her death. It was not made a condition that it should be so given, but the reference to such a probable claim upon her bounty would be likely to be regarded as a recommendation of her deceased father that it should be given to him. It was not certain whether her husband was living, as he had been some time absent from her without being heard from. In the contingency that it should afterwards appear that he was dead, she proceeds to distribute the $50,000, intended for him, among other legatees, the considerable sum of $10,000 being given to his nephew, who had not, so far as appears, any other claim upon her bounty than his relationship to her husband.

The parol evidence showed that she had, nominally, nearly $54,000 of her own property, of which about $7,000 was uncollected interest and worthless bonds, leaving about $47,000 of available means; and moreover, that she was well acquainted with the condition and amount of her property. When she executed her will she was on her death-bed, which fact she was well aware of. Her will, therefore, according to her own expectation and belief, was to take effect immediately, without any possibility of her means being increased or in any way changed; and the events transpired precisely according to her anticipations. Besides the $50,000, she bequeathed $32,000 in pecuniary legacies, among her friends and relations, besides giving a contingent residue, and besides the specific bequests of her clothing, jewelry, pictures, &c. These pecu-

niary legacies, added to the $50,000, would have greatly exceeded the amount of her property, and a large abatement will have to be made from the legacies, if it should be considered that the $50,000 is not included in the dispositions of the will. To the extent of these abatements, her will must be held inoperative and her intentions disappointed. If that sum is included, all the legacies can be paid according to her intention; and a sum not entirely illusory will be left for her residuary legatees.

If, therefore, the question be regarded as depending wholly upon the intention of the testatrix, and that intention can be collected from the provisions of the will applied to the state of her property and her personal condition at the time it was made, I should conclude, with a good degree of confidence, that the power to dispose of the $50,000 was executed by that instrument.

Another consideration of the same tendency has considerable weight on my mind. This sum of $50,000, though not her property in a technical or strictly legal sense, differed but little from property which was absolutely hers. She had had the use and enjoyment of it by the receipt of the interest from the time of her father's death—for nearly twenty years. It was given to her and her issue, so that if she had left children, it would, in a general sense, have been their inheritance. She had, moreover, the right to dispose of it to any one or more persons, according to her own absolute will and pleasure, only observing the directions to make the disposition by will. It is not singular that in attempting to dispose of it, she should regard it as of the same nature as her own property. The actual condition of it, in the hands and under the management of her brothers and their mercantile partner, was precisely the same as the condition of the funds which had accumulated from her savings. It would have been singular if, in making her will, without the assistance of legal counsel, she should have made any distinction between the two classes of property; and I am persuaded, that if we should hold this fund to be undisposed of by the will, we should do great violence to the intention of the testatrix.

But it is insisted, on behalf of the defendants, that we cannot take into consideration the amount or condition of the testatrix's property in determining whether she had the power of appointment in view when executing her will. This may be done, it is conceded, where the subject of the power is real estate, but never, it is contended, where it is personal. The distinction is, that every devise of real estate, even of a residue, is specific. A will of land is considered as a conveyance, taking effect, it is true, only at the testator's death, but operating then only upon such estate as he had when the will was made. In a will of personalty, on the other hand, we look to the testator's death to ascertain the fund upon which it is to operate, so far as general gifts are concerned. The ownership of property of every kind, and especially of personalty, is changeable. A man may be poor to-day and rich some years hence. When, therefore, a testator makes his will of personal estate, he looks to his condition at the time of his death, and not to his present possessions; and no certain inference, it is said, can be deduced from the amount or situation of his property at that time, in ascertaining his intent in framing the dispositions of his will. The premises upon which this argument is based are correct, but the conclusion, if common observation and experience are taken as guides, is stated too broadly. A man may make his will provisionally, and so arrange his gifts as that his general intentions will be carried out whether he dies possessed of more or less property. Commonly, as we know, that act is done with a reference, more or less direct, to the means which he then has to dispose of. But whether he makes it with one view or the other, the law will ascertain the fund upon which it is to operate by taking an account of the personalty which he possessed at his death, without any reference to the amount when the will was executed. This is in obedience to the positive rule which declares that a will of personalty speaks as of the time of the testator's death. It has no reference to the intentions of the testator. The law holds that he cannot have an intention in contravention of the rule of law. But when a testa-

tor, possessed of a power to dispose of property of which he is not the owner, makes a will without referring to the power, it is a question of intention whether the will embraces the subject of the power. Hence, in *Blagge* v. *Miles* (1 Story's R., 426), where the testatrix had an equitable estate for life in lands in Massachusetts, with a power to dispose of the remainder in fee, and a part of the lands was disposed of and the proceeds vested in other lands in New London, in Connecticut, upon the same trusts, and hence subject to the powers, pursuant to a valid resolve of the legislature of the first mentioned State, and having no other real estate in New London, she made her will without referring to the powers, devising those lands in New London to one person, with a residuary clause of all the rest and residue of her estate, real and personal, to other beneficiaries, it was held that the remainder of her lands in Massachusetts passed. This was held upon the ground that whether the will was an execution of the power or not depended upon the intention of the testatrix; and the intention to execute it was shown by her disposing of the land in Connecticut to which she had no right, except by virtue of the power. Her intention to execute the power having been thus ascertained and established, it was concluded that the other property subject to it passed under a general devise in which neither the power or the subject of it was named.

So if the power be to a woman to appoint the uses of land by last will whether she be married or single, and she, being a married woman, and therefore generally incapable of making a will, devise the land by her last will and testament, with no reference to the power, it is held a good execution of the power. This doctrine proceeds upon the argument, that by doing a thing which, independently of the power, would be nugatory, she conclusively evinced her intention to execute the power. (*Curtiss* v. *Kemich*, 9 Sim., 444; *Churchill* v. *Dibden*, id., 447, in note; *S. C.*, 3 Mees. & Wels., 446.)

So, also, if the subject of the power be real estate, and the person entitled to appoint its uses have no real estate, if he

give by a will not referring to the power, all his real and personal estates, the estate, subjected to the power, will pass. (Sugden on Powers, ch. 6, § 7, pp. 33, 34.) The reason is, that by embracing real estate in the disposition, the testator must have intended to dispose of that species of property, and having none upon which the will could operate, except that affected by the power, it is clear that it was that which he intended to dispose of.

Besides these instances in which the intention was clearly the governing principle in the decision, we find the judges uniformly declaring that it is unnecessary to refer to the power if an intention to execute it plainly appears. Thus, in the early case of *Probert* v. *Morgan* (1 Atk., 440), we find Lord Chancellor HARDWICKE declaring, that "if a man have power to charge an estate, it is not necessary, in the execution of it, that he should refer to the deed out of which the power arises; for in a court of equity it is enough that his intent appears; and if in the execution he sufficiently describes the estate he has power to charge, the estate is certainly bound, especially where the person charging is the purchaser of the powers." So in *Molten* v. *Hutchinson* (id., 558), and *The Matter of Caswell* (id., 559), it was admitted that it was unnecessary to refer to the power; but, as Lord HARDWICKE said in the last case, "he must do such an act as shows he takes notice of the thing he had power to dispose of." In *Bennett* v. *Aburrow* (8 Ves., 609), Sir WILLIAM GRANT, master of the rolls, laid down the general rule thus: "This (the question whether a particular disposition was an execution of a power) was always a question of intention, whether the party meant to execute the power or not. The intention," he added, "may be collected from other circumstances, as that the will includes something the party had not otherwise than under the power of appointment; that a part of the will would be wholly inoperative unless applied to the power. There is nothing of that sort in this case. No description of property is disposed of that there is not something to answer." And Judge STORY, in *Blagge* v. *Miles*, already referred to, states the spirit of the English cases, most of

which he had examined, in the following language: "But
the principle furnished by them, however occasionally misap-
plied, is never departed from, that if the donee of the power
intends to execute, and the mode be in other respects unex-
ceptionable (that is, if it correspond to the former require-
ments of the power), that intention, however manifested,
whether directly or indirectly, positively or by just implica-
tion, will make the execution valid and operative. I agree
that the intention to execute the power must be apparent
and clear, so that the transaction is not fairly susceptible of
any other interpretation. If it be doubtful under all the
circumstances, then that doubt will prevent it from being
deemed an execution of the power. All the authorities
agree that it is not necessary that the intention to execute
the power should appear in express terms or recitals in the
instrument. It is sufficient that it shall appear by words,
acts or deeds demonstrating the intention."

We come now to the precise question upon which this case
must turn. As a will of personalty looks to the death of the
testator to ascertain the subject upon which it is to operate,
is it possible, in any case, to compare the dispositions of the
will with the state of the testator's property at the time it
was executed, for the purpose of deducing an intention to
dispose of property which the testator did not own, but
which he had a right to dispose of under a power? The
terms in which the principle that the intention to execute
the power is to govern in determining in a given case whether
it has been executed, is usually stated, would admit of such
a comparison, and in many probable cases which might be put
would demonstrate, without the possibility of mistake, that
such an intention existed. If, for example, a man, possessed
of a mere modicum of property, but clothed with a power to
dispose of many thousands, in which he had enjoyed a life
estate, should be condemned to be capitally executed, and all
applications for pardon had been denied, and should make
his will, without noticing the power, bequeathing, in pecu-
niary legacies, sums corresponding with the amount dispos-
able under the power, it would be perfectly evident that he

relied wholly on the power of appointment to give effect to the testamentary act; and yet, if his circumstances could not be inquired into, the intention could not be shown, and the will would be inoperative.

There are, however, several cases in which the English courts appear to hold that no such comparison as has been suggested can be made. *Andrews* v. *Emmot* (2 Brown's Ch., 297) was decided in 1787, by Lord Kenyon, then Sir Lloyd Kenyon, master of the rolls. By a marriage settlement, between the plaintiff and John Andrews, executed in Dec., 1775, the plaintiff conveyed to trustees £30,000 in public stock, in trust, to permit her, the plaintiff, to receive the dividends until marriage, and afterwards to pay them to Andrews, the husband, for life; and if the plaintiff should survive him, to raise £500 and pay it to her, and to pay the interest on the residue to her for life; and after the death of both, to distribute the stock among the children of the marriage, in a manner mentioned; and in case there should be no children (and there were none), " on trust to transfer the stock to such persons, and in such shares, &c., as Andrews should by deed or will appoint, and in default of such appointment to such persons as the plaintiff should by deed or will appoint, and in default of any appointment, to the executors or administrators of the plaintiff." Andrews covenanted that if the plaintiff should survive him, she should have all his real and personal estate for her life. The marriage took place; and about three months after the settlement, Andrews made his will without noticing the settlement, or the power, giving several legacies, with a residuary clause of all his personalty, the whole payable after the decease of his wife. A reference was ordered to take an account of the personal estate of Andrews, at the time of making the will. The report did not correspond to the order, but stated an account of his personalty at the time of his death, in 1779, showing a deficiency at that time of the amount of the legacies. The bill was filed by the wife, who had survived her husband, for the transfer of the stock to her, for default of an appointment by the

husband; which was ordered, and the decree was affirmed by Lord Chancellor THURLOW. The counsel for the respective parties agreed that the question was one of intention; and, on behalf of the plaintiff, it was urged with great force, as it seems to me, that as the will was made so soon after marriage, when there was no improbability of issue, and as Andrews had property of his own upon which the will would operate, the probability was that he had no intention of executing the power. The master of the rolls said the question was, whether he meant to execute the power; but he thought that as he had property of which he could dispose, and thus the will would be operative, it ought not to be held an execution of the power, and that to send it to inquiry, as to the quantum, of that property, might lead to conjecture, which was a method of deciding cases to be avoided if possible. On the appeal, the counsel for the defendants sought to have the reference as to the property of the testator when the will was made, executed, as they thought it was material on the question of intention. The lord chancellor thought the reference immaterial, and that the case was almost too plain for argument. He took notice that the fund was originally the property of the plaintiff. It was necessary, he said, to the execution of the power, that the husband should, by his will, notify his intention to do it. "It is too late now," he added, "to expect that a testator, in order to execute a power, shall make an express reference to it; because it has been determined that if a man disposes of that over which he has a power, in such a manner that it is impossible to impute to him any other intention than that of executing the power, the act done shall be an execution of the power. But the doctrine is not carried by any case further than this, and it would be cruel to do it, as it would be throwing the property of testators into utter confusion. Then you must go out of the instrument itself to gather the construction of it. I do not mean by saying this, to exclude the rule that where there is what has been called a latent ambiguity in the will, you shall not go out of the will to explain the testator's intention by circumstances, but to

inquire into the testator's situation, in order to gather from thence what it is probable he meant, is a great deal beyond that. Here the testator has made a will, by which it does not appear that he recollected the settlement made upon the marriage; at least there is only one circumstance, the postponement of the residue until after the death of his wife, by which he appears to remember it."

I have stated this case a good deal at large, because it is the first case I have met with which determines that the amount of the property, at the date of the will, cannot be inquired into, and because the case is very generally referred to in the subsequent cases as the foundation of the rule. The case was without doubt correctly decided. The testator had a considerable and probably a large personal estate besides this stock of his wife. By the settlement this belonged to the wife, for life, if she survived him, and at her death, in default of issue, it became subject to any testamentary disposition which he might make, or might have made. He made his will very soon after the marriage, making his legacies payable after her death, when his own property would become disposable. The stock over which he had a contingent power would not be liable to be affected by that power, except in the contingency that there should be no issue of a marriage then recently consummated; and the amount of his own property, subject to the will, could not be ascertained until the expiration of the lives of both himself and his wife. Under such circumstances, there was really no ground for supposing that his will had any reference to the stock; and an inquiry as to his personalty, at the time it was executed, would determine nothing as to his intentions beyond the merest conjecture. This case was commented on, with approval, by Lord LOUGHBOROUGH, in *Standen* v. *Standen* (2 Ves., 589), and by the master of the rolls, in *Hales* v. *Margerum* (3 id., 299), but both those learned judges take prominent notice of the special circumstance that the will was made early after the marriage, and that the interest of the husband under the power was contingent, and, *prima facie,* would not be considered

as embraced in a testamentary paper, which professed only to dispose of his own property.

But in *Nannock* v. *Horton* (7 Ves., 391), the principle that the amount of property at the time of making the will could not be regarded in ascertaining whether the power was intended to be executed, was carried to an extreme length. By the will of Thomas Norman he directed that £6,000 of three per cent consols be purchased in the name of his executors, and gave the interest and dividends thereof to his son, Robert Norman, for life, with a power of appointment in him as to £4,000 of the stock in favor of such person or persons as by deed or will, executed in the presence of two witnesses, he should direct. He also gave him a pecuniary legacy of £4,000. By the will of Robert Norman, which did not refer to the power, he bequeathed to his mistress £2,000 of such stock as was mentioned in the power; to his wife, £1,000, and to five other persons £500 each, and did not dispose of the residue, or appoint executors. It appeared that, exclusive of his right to the £4,000 of stock to which the power related, his whole personal estate was not equal to the legacies given by his will. One of the several questions debated was whether the will could be considered an execution of the power, and it was held it could not. Lord ELDEN set off with the singular remark: "I am not sure that the rule does not oblige the court to act against what probably might have been the intention nine times out of ten." He proceeded to say that the legacies were not specific, though of the same kind of stock as that embraced in the power, as, if he had no such stock, it would have to be purchased by the executors for the legatees. He then referred to the distinction between wills of real estate and of personalty — that the former were specific, and the latter looked to the death of the testator. He then mentioned *Andrews* v. *Emmot*, and said that case, and others of that class, referring evidently to *Standen* v. *Standen* and *Hales* v. *Margerum*, "are clear, distinct and positive, and express to the point, that you are not to inquire into the circumstances of the testator's property at the date of the will, to determine whether he was executing

the power or not;" and he concludes by saying, that "whatever might have been the intention, I am bound by the authorities to. say this testator did not mean to affect any property but what was his own."

After this very emphatic judgment of the eminent chancellor, it was not to be expected that any English equity judge would depart from the rule thus laid down.

Accordingly, in *Jones* v. *Tucker* (2 Mer., 533), there was a devise to a trustee of certain real estate, in trust to permit Elizabeth Smith, widow, to receive the rents, &c., for life, and upon her death the trustee was to sell them and out of the proceeds to pay £100, which was bequeathed to such person or persons as the said Elizabeth Smith should, by her last will, appoint; and subject to this, the estates were given to the defendant. Elizabeth Smith made her will as follows: "I will and bequeath to Mrs. Mary Jones (the plaintiff) the sum of one hundred pounds; likewise the whole of my household furniture, plate and linen, &c. Likewise I appoint the said Mary Jones to be my sole executrix." Mr. Sugden, who was for. the plaintiff, asked for a reference to inquire into the state of the property of the testator at the time of making the will, it being alleged in the bill that she was not possessed of or entitled to any personal estate, except a few articles of household furniture, which were, shortly after her death, sold for £13, which was applied to the payment of her funeral expenses. This was opposed; and it was argued that. the rule, as laid down in *Andrews* v. *Emmot*, was that there could be no inquiry as to the circumstances of personal property with a view to this question. The master of the rolls, Sir WILLIAM GRANT, said "this was as strong a case for an exception to the rule, as could be brought before the court." "If a person," he added, "having no property at all, and only a power over a certain sum of money, gives that single sum, little doubt can arise as to her intention. But the question is, how we can get at the fact, and whether there can be an inquiry for the purpose of ascertaining it." He then. went over the cases of *Andrews* v. *Emmot* and *Nannock* v. *Horton*, and concluded thus: "In my own

private· opinion I think the intention was to give the £100 which the testatrix had power to dispose of; but I do not conceive that I could judicially declare the power to have been executed, even if the result of an inquiry should verify the representation that is made as to the state of her property."

In *Jones* v. *Curry* (1 Swans., 66), the case was this: There was a bequest to Isabella Cammon, of certain household furniture, beds, linen, &c., and all the residue of the testator's personal effects for life, with power to her to bequeath the same by her last will and testament. By her will she gave the whole to her father and mother, for life, with remainder, except her household furniture, linen and plate, two legacies of £100 each, and one of £50, and an annuity of £10 per annum. She had no furniture except that which she held under the bequest for life, and no other property, except a mortgage debt of £100. It was held by Sir THOMAS PLUMER, master of the rolls, that the will did not pass the property embraced in the power. He puts the decision upon the last mentioned case of *Jones* v. *Tucker*, and states the question to be whether the court can collect from the face of the will an intention in the testatrix to pass this property. "I say," he adds, "on the face of the will, because it is now clear that the court cannot look beyond the will, whatever is the inadequacy of a testator's property to satisfy the terms of a will; and whatever may be the conviction of the court of his intention to execute the power, the state of his personalty at the time of the will, or of his death, cannot be examined for the purpose of collecting evidence of his intention."

After these cases the rule seems to have been generally acquiesced in. In the following cases testamentary gifts, which in terms embraced only the testators' property, but in which there were pretty strong presumptions that a power of appointment which the testators possessed were intended to be exercised, were decided against the parties claiming under the power. (*Webb* v. *Honner*, 1 Jac. & Walk., 352; *Lovell* v. *Knight*, 3 Sim., 275; *Lempneie* v. *Valpy*, 5 id., 508; *Buxton* v. *Buxton*, 1 Keene, 753; *Hughes* v. *Turner*,

3 Mylne & K., 666.) In some of these, public stocks of the same descriptions with those embraced in the power, were given by name; in others, portions of the property over which the power extended, were specifically given, and in one of them, *Lovell* v. *Knight*, the testatrix had nothing of importance to bequeath, except that which the power authorized her to dispose of. But the court steadily adhered to the doctrine that it could not inquire into the property of the testator when the will was made.

In *Davies* v. *Thorne* (3 De G. & Sm., 347), anno, 1849, a testatrix had, under a will made in 1833, a power of appointment over £1,000, and gave several pecuniary legacies of different sums, amounting together to precisely £1,000, and gave her clothes to one of her sisters. Independent of the fund subject to the power, her property was altogether insufficient for the payment of the legacies. It was, however, held by Sir J. L. Knight Bruce, vice-chancellor, that the will was not an execution of the power. According to the report in the Jurist (vol. 13, p. 384), he remarked, in giving judgment: "I must, although almost ashamed to say it, decide against what I firmly and sincerely believe to have been the intention of the testatrix, that the power of appointment has not been exercised. I am bound, however, by the authorities; I cannot help myself, and I must so decide."

The force of these cases, and several others of a similar tendency, which I have examined, but which it would be tedious to cite, is, I think, somewhat broken in upon by the case of *Innes* v. *Sayre*, decided in 1849 and 1851, in the first instance by Vice-Chancellor Wigram, and affirmed on appeal by Lord Chancellor Truro (1 Hare, 377; 8 Eng. Law & Eq., 157). The testatrix had, under her marriage settlement and under the will of her late husband, power of appointment, by will, over about £4,830 of three per cent public stocks, all of which, except about £500, were of the class called three per cent consols. By her will she gave two legacies of £1,000 each and three of £500 each, all except one to charities; and she left the "remainder in the three per cent," and certain stocks of other kinds, to trustees, for certain other

beneficiaries. This was held an execution of the power of appointment. As she had no stocks of the kind mentioned, in her own right, at the time of making her will or at her death, it was considered that she must have referred to the three per cent consols as an existing thing, though, standing by themselves, these legacies of stock must be considered as general and not as specific legacies. Much stress was placed on the word *remainder*, which indicated, it was thought, that some specific fund, capable of division, was referred to, and that must have been the aggregate of the three per cent consols. When it was considered that bequests of particular stock are not specific, and that when there is not such stock on hand at the death of the testator, it must be purchased, or an equivalent in money paid, it is impossible to reconcile this case with the doctrine that you cannot inquire as to the testator's property subject to his will, in order to ascertain whether he intended to execute a power of appointment. This shows that the court was embarrassed by the rule and sometimes struggled to avoid its effect when its application would disappoint the intentions of the party authorized to execute a power.

It will be observed that there is no English case which presents the circumstance of a will executed *in extremis*, and where that fact was known to the testator. Whether that would be considered as furnishing an exception to a rule founded upon the consideration of the ambulatory character of a will of personalty it is impossible to say. It is of the nature of general rules that they must be sometimes applied to cases not within the reasons upon which they were established. This inconvenience is, however, generally compensated by the certainty which is secured by having a steady principle to appeal to in doubtful cases. It enables parties to understand their rights, and prevents litigation. It would be easy to make a popular argument against a series of adjudications which, while they profess to carry out the intentions of parties clothed with powers of this nature, do, by the application of positive and artificial rules, so often disappoint those intentions. But I should not feel authorized to act

upon such reasoning, if the judgments were those of our
own courts, or of tribunals whose judgments were binding
upon us. But the cases which hold that the state of the
property of a testator cannot be taken into account in deter-
mining whether he intended to execute a power over person-
alty, were determined since the judgments of the English
courts ceased to be authoritative precedents with us. I can
find no distinct statement of that doctrine prior to the revo-
lution.

*Sir Edward Clare's Case* (6 Co., 17 *b*), which is often
cited in this connection, has very little, if any, bearing upon
the question. One Harwood was seized of an acre of land,
and made a feoffment of it to another, to such uses as he
should appoint by his last will; and by his will he devised it
to a person under whom the plaintiff claimed. It was held,
first, that Harwood was seized of a qualified fee, notwith-
standing the feoffment, until he executed the power. This,
I suppose, was by force of the statute of uses. Secondly, if
he devised the estate pursuant to the power, the devise would
take effect by force of the feoffment, the use being directed
by the will; but if he devised it without reference to the
power, it passed as an ordinary devise by an owner, for he
was truly the owner, besides having an authority to appoint
the use; and when he devised it, he elected to dispose of it
as owner. But it being land held *in capite*, he could only
dispose by will of two-third parts, the statute of wills (32 H.
8, ch. 1, § 7), having limited disposition of lands held by
that tenure to that proportion; and if one had before given
lands to his wife, they were reckoned as part of what he
might give by will. It happened that Harwood originally
had, by the same tenure, three acres in all, each of equal
value, and had conveyed two acres for the use of his wife
for her jointure. It followed that he could not devise the
third acre as owner under the statute, "and it could not take
effect by the will for two parts, and by the feoffment for the
third part;" but there was, it seems, no difficulty in disposing
of the whole by means of a feoffment to uses like the pres-
ent, and a testamentary limitation of the use; but this was

*obiter.* It was therefore held, thirdly, that if Harwood had made the feoffment to the use of his last will, and had then devised it by an instrument referring to the feoffment, it would be void for a third part, because a feoffment to the use of a will is the same thing as one to the use of himself and his heirs; but, fourthly, as the devise in the case at bar was general, not specifying whether it was in the execution of the power or as owner, "the devise ought of necessity to to inure as a limitation of a use, or otherwise the devise shall be utterly void." Therefore (the action being an *assise*) judgment was given for the plaintiff for the whole land.

The principles deducible from this often quoted case are, first, that it is not absolutely essential for an instrument made in the execution of a power to refer to the deed creating the power; and secondly, that if the party devising is the general owner, and is also authorized to appoint an estate under a feoffment to uses, which it seems may concur without a merger, and he devise generally without referring to the power, and the circumstances are such that as owner he could not make an operative devise, the instrument shall take effect as an appointment, on the maxim *ut res magis valent quam pereat.* The circumstance which, in *Clare's Case,* prevented the devise from taking effect on the testator's interest as owner, was, that he had exhausted his disposing power as owner by the gift of two-thirds of his lands to his wife. But suppose some other circumstance existed, such as that he had no interest or estate, but only a power, and yet the devise was general, not referring to the power, it would, upon the doctrine of the case, take effect as an appointment; and several cases of devises have been referred to where that doctrine was applied, and for these adjudications *Sir Edward Clare's Case* was certainly an authority. Where the disposition is of personalty, and the testator is not the owner of it, but had a power to dispose of it, the reasoning of the case would apply by analogy. There is certainly nothing in it hostile to such an application. But the later English cases prevent the doctrine from being so applied, by forbidding an

account of the testator's personal property to be taken, and thus shutting out the evidence necessary to raise the question.

Reliance may have been sometimes placed upon that part of one of the resolutions, where it is said that the devise could not take effect by means of the interest of the testator upon two-thirds of the acre, and by means of the power upon the other third. This may be true where the gift is of an entire thing, as this acre of land. But it does not apply to a gift of personalty. There is no difficulty in saying that so far as the testator was the owner, the gift shall take effect as a disposition by the owner of that part, and so far as he had no right except under the power, that it shall operate to that extent as an execution of the power.

There are two other cases decided before the revolution, which are relied on by the defendants' counsel, *Molten* v. *Hutchinson* (1 Atk., 558), and *Ex parte Caswell* (id., 559), already cited. In the first, a will of personalty, which bequeathed several legacies and gave the residue in a general clause, was claimed to be a good execution of a power possessed by the testator, to dispose of £400, by writing, signed in the presence of three witnesses. If not so disposed of, the money was to go to a charity. Parol evidence, it is said, was offered to prove that it was the intent of the testator that the £400 should be disposed of by his will, but it was not allowed. It was held that the will did not embrace it, and the money was decreed to the charity. The case only proves that what a testator said respecting his intent in making his will is not competent evidence; and that a power is not executed by a general will unless the subject is described, or it be shown that the will would not have full effect unless it should be held to embrace the execution of the power. In the other case, a will devising the residue of the testator's real and personal estate, was held not to be a good execution of a power, contained in a settlement by which the testator, as owner of copyhold lands, had surrendered them to trustees for the use of certain persons for life, and then to such uses as he should by deed or will appoint, and in default of an appointment, to his son.

The testator had other lands. This could not be a valid appointment, unless any instrument having the prescribed formalities, and which would have been sufficient to convey the land, if the party executing it had been the general owner, would have been an appointment. There was nothing whatever to show that the testator had the power in his contemplation. The remark of Lord HARDWICKE, in deciding this case, has been already mentioned.

. What has been said is sufficient to show that the doctrine that there can be no inquiry into the state of the personalty, for the purpose of ascertaining whether a testator, in making a will, claimed as the execution of a power, had that authority in his mind and intended to employ it, is of modern growth in the English courts, and had not been manifested by any case adjudged prior to the American revolution. The subsequent adjudications are not authoritative with us. We receive them as able and intelligent applications of the legal principles which we hold in common with them to new cases as they arise, and we follow them only when they accord with our own judgment. It appears to us that the rule referred to is too narrow; and we have, moreover, the opinion of eminent English judges that it often frustrates the intention of the authors of those instruments. The British parliament appears to have come to the same conclusion, for, by a recent statute, it has been wholly abrogated; and the rule which the legislature has adopted, is "that a bequest of the personal estate of a testator, or any bequest of personal property, described in a general manner, shall be construed to include any personal estate, or any personal estate to which the description shall extend (as the case may be), which he may have power to appoint in any manner he may think proper, and shall operate as an execution of such power unless a contrary intention shall appear by the will." (7 Wm. IV, and 1 Vic., ch. 26, § 27.) The same act contains a similar provision in regard to wills of real estate, the parliament following in the last mentioned provision our act of 1830. (1 R. S., 737, § 126.) Any person who will examine the cases in which the rule I have been

considering has been applied, and the remarks of English systematic writers, and who will call to mind the manner in which British statutes relating to civil jurisprudence and the laws of property are now framed, namely, on the recommendation of the lord chancellor, and after consultation with the judges of the higher courts, will not for a moment doubt but that the change was made to get rid of an unjust rule which had become too firmly established by the courts to be otherwise abrogated. I refer particularly to the remark of Lord ST. LEONARDS, in his treatise on powers, in which he says that in reviewing the cases upon the subject, he thinks it impossible not to be struck with the number of instances where the intention has been defeated by the rule distinguishing power from property. He distrusted the efficiency of a legislative remedy, and thought, apparently, that the mischief might better be remedied by the courts. (Sudgen on Powers, law lib. ed., 419.) He was overruled, or perhaps changed his mind, for the act appears to have been passed the year succeeding that in which the edition containing the remark I have quoted was published.

I feel confident that we ought not to follow a rule thus condemned, and which has been abolished in the country by whose courts it was established. Hence, I am in favor of affirming the judgment of the Supreme Court in the present case.

All the judges concurring.

Judgment affirmed. BROWN, J., absent.