McLoskey *vs.* Reid.

*In the matter of the Estate of* Patrick McLoskey, *deceased.*

The appointment of a guardian for the person or the property of an infant is an act of jurisdiction dependent upon the situation of the person or the property within the territory of the State. This authority is not limited to cases of subjects or citizens.

Foreign guardians have no extra-territorial authority, and letters of foreign guardianship afford no title within this State.

The laws of the domicil in relation to the power of the guardian are sometimes recognized, but this is a matter of comity, and rests in the discretion of the court.

In all cases where legacies are due to minors, the Surrogate must direct the money to be paid into court, to be invested for the minor's benefit, and the income applied for maintenance, unless there be a general guardian who has given adequate security.

Where executors have withdrawn productive funds, in order to pay legacies before they became due,—*Held*, that they were chargeable with the loss thus occasioned to the residuary legatees.

The testator bequeathed six thousand dollars to each of his sisters, to be invested, and not "transferable during their life;" one of the legatees having died before the testator,—*Held*, that the bequest lapsed.—*Held*, also, that it was not the intention to limit the donees to a life estate, but to restrain the mode of enjoyment through the medium of a trustee, so that the principal fund could not be alienated until death.

A subsequent will not executed with the forms requisite to pass real estate, is

not a revocation of a previous will duly executed, and both instruments may be admitted to probate, the one as a will of personalty, and the other as a will of realty.

> Lot Clark.
> John H. Voorhees, *for Executors*.
> J. Larocque, *or Infant Legatee*.
> B. F. Dunning, *for General Legatees*.
> Abijah Mann.
> Field & Foster, *for Residuary Legatees*.

I. No legacies by the will of the testator were payable till one year after the executors took upon themselves the execution of the trust, and so much of the funds as were invested should have been kept accumulating till one year had elapsed, for the benefit of the estate or the residuary fund. The legacies to Jane Westfeldt and to the executors; amounting to $54,000, were not payable till the expiration of one year. (See 2 *R. S., p.* 275, 4*th ed., sect.* 48.) Sect. 50, *id.*, provides when the specific legacies shall be paid. (*Bradner & Wife* vs. *Faulkner & Wife*, 2 *Kernan*, 472, 1 *Barb. Ch. R.* 91, &c.)

II. The executors had no right to take the legacies bequeathed to them till the settlement of the estate before the Surrogate, as it was bequeathed to them in lieu of commissions. When they converted the funds on 5th April, 1855, to their own use, they became liable for the interest on the same. There is no pretence on the part of the executors that they kept this $54,000 on hand for the year; their own return to this court shows the opposite. (*Dunscomb et al.* vs. *Executors of Dunscomb*, 1 *John. Ch. R.*, 508, &c.; *Wright's Executor*, 209, 210; *Dayton, Surrogate*, 2 *ed.*, 488; *Ogilvie* vs. *Ogilvie*, 1 *Bradf. Surr. Rep.* 356.)

III. We insist that the legacy of $6,000 to Margaret McLoskey has lapsed, in consequence of her decease prior to the death of the testator, and that the same has passed into the residuary fund, and that the residuary legatees are entitled to the same.

IV. We ask the Surrogate to decree that the executors invest as trustees the $6,000 bequeathed to Bridget McLoskey for her use during her life, and that on her death the same be paid to the residuary legatees of the testator for their use and benefit; she, by the terms of the will, having only a life estate therein.

V. No costs should be allowed to the executors for services of attorneys, &c.

THE SURROGATE.—Upon the final accounting of the executors in this case, it becomes necessary to determine what directions shall be given in respect to a legacy of fifteen thousand dollars, bequeathed to a minor residing at Florence. It appears that a guardian has been duly appointed at the place of domicil, and authority been regularly conferred upon the Consul General of Tuscany to receive the legacy from the executors.

The appointment of a guardian for the person or the property of an infant is an act of jurisdiction dependent upon the situation of the person or the property within the territory of the State. The exercise of this authority flows from the duty incumbent upon the body politic to afford protection to those who are unable to take care of themselves. It is not limited to the cases of subjects or citizens, but extends to all who from their tender years require guardianship of person or estate. This important prerogative has ordinarily been administered through the Court of Chancery, though, in this country, at an early period, it was found convenient also to confide its administration to tribunals having probate jurisdiction. A guardian may be appointed for the person or for the estate of an infant —or for both. In the case of *Johnstone* vs. *Beattie*, (10 *Cl. & Fi.* 42,) the House of Lords determined that it was competent for the Lord Chancellor to appoint a guardian for a minor, whose domicil was in Scotland, where there were testamentary guardians, and who was only temporarily resident in

England. The principle was there settled that foreign guardians have no extra-territorial authority by virtue of their office, and that the Court of Chancery, when acting in these matters, always "requires that there shall be a guardian appointed within the jurisdiction of the court, responsible to the court, and subject to its jurisdiction and authority." In *Stephens* vs. *James*, (1 *My. & K.* 627,) an infant had been taken by its father to America, and the court entertained jurisdiction, and ordered maintenance out of the infant's estate, though he was residing in a foreign country. I can find no reason for doubting that the *situs* of assets belonging to a minor has always been considered a sufficient basis for a grant of guardianship.

The rule in this country was definitely settled many years since. In *Morrell* vs. *Dickey*, (1 *Johns. C. R.*, 153,) Chancellor Kent held that letters of foreign guardianship afforded no title within this State, and he placed the doctrine on the same principles which prevent a recognition of foreign executors and administrators. This analogy appears to be sound and reasonable, and the decision has never been questioned. Chancellor Walworth decided that a foreign executor or administrator might be sued in equity, and expressed the opinion also that a foreign guardian was, in like manner, amenable to the same jurisdiction; but it is manifest that a capacity or title to sue differs widely from a capacity to be sued. In *Kraft* vs. *Wickey*, (4 *Gill & Johns, R.*, 332,) the question was carefully considered, and it was concluded that guardians can sue only in the courts of the country from which they derive their power, although, in a court of equity, the domestic guardian, who has charge of the property, will be compelled to provide for the maintenance and education of his ward resident abroad. The reason upon which a foreign guardian is denied any recognition of his title is substantially this—that all his authority springs out of his official character; and a civil officer as such, can, of necessity, possess no power beyond the limits of the sovereignty by which he is appointed. Such exceptions as may exist, have been admitted, not *de*

*jure*, but *ex comitate.* The *lex fori* primarily prevails in the form and order of the administration of justice, and foreign law is only received so far as it is found consonant with sound principle and public convenience—it is accepted on the basis of international comity, and not because of any inherent right. The continental jurists go further, and insist upon the absolute right and title of the guardian appointed at the place of domicil, wheresoever the ward is to be represented; but, neither in England nor in the United States does this doctrine prevail. Still, however, we recognize and give effect to those laws of the domicil of a party which constitute the *status*, quality, or capacity of the person, and place minors under the authority of tutors or guardians, to such an extent as in the discretion of the court may seem wise and proper. (1 *Burge Com. pp.* 5, 14, 25; *vol.* 3, *p.* 1010, *Story Conf. L.*, § 492 *to* § 504, *a.*) In this view it might perhaps be competent for a court of equity to permit an administrator or executor to transmit the funds of a minor domiciled in a foreign country to the guardian abroad, on satisfactory evidence being given that adequate security has been afforded for the faithful administration of the property. This, however, would clearly be a matter of discretion, and not of strict right. In the absence of special direction, it might fall within the province of the Surrogate to exercise such a discretionary power, but the statute has expressly provided the mode in which the rights of minors in this respect must be protected, and there is no room, therefore, for any course of procedure resting upon doubtful or implied powers. The Revised Statutes authorize executors to pay legacies due minors " to the general guardian," " who shall be required to give security to the minor, to be approved by the Surrogate for the faithful application and accounting for such legacy;" " and if there be no such guardian, or the Surrogate do not direct such payment, the legacy shall be invested in permanent securities, under the direction of the Surrogate, in the name, and for the benefit of such minor, upon annual interest, and the interest may be applied under the direction of the Surrogate, to the

support and education of such minor." (2 *R. S., p.* 91, §§ 47, 48, 49, 50, 51.) Even if there be a general guardian, deriving his authority under our State law, the Surrogate must see that proper security has been given before requiring the executor to pay the legacy; and if no guardian has been appointed or security has not been given, the Surrogate must direct the funds to be paid into court, and invested for the minor's benefit. This course may in some cases work a hardship; but the law is designed for the protection of infants, its provisions are precise and special, and it is my duty to see them properly enforced. Unless, then, a guardian be appointed within this State, the legacy due to this infant must be paid into court, and invested for his benefit. The interest may be transmitted to the place of domicil, from time to time, for the maintenance and education of the legatee, under the direction of the Surrogate.

The testator gave to his niece, wife of one of the executors, the sum of fifty thousand dollars, and to each of the executors, in lieu of commissions, the sum of two thousand dollars. These legacies were paid soon after the grant of letters testamentary, and the residuary legatees now claim that the executors should be charged with interest for the period intervening between the time of payment and the date when the payment should have been made in the usual course of administration. The term of one year is allowed for the adjustment of an estate, and legacies are not ordinarily payable before, unless the testator has specially directed. On the other hand, residuary legatees are entitled to all the profits and increase, (*Pearson* vs. *Pearson*, 1 *Sch. & Lef.* 10,) to all the interest and income accruing during the year allowed for settlement. In other words, the property is theirs, subject only to the payment of charges, debts, and legacies. If any debt or legacy be claimed before it becomes due, their rights are affected if the executors withdraw a productive fund, for the purpose of paying the debt or legacy, without compelling a rebate of interest. In such a case the executors should make good the loss to the parties injured. For example, these

legacies of fifty-four thousand dollars, at the time of payment, were worth less than their face by the interest up to the time they fell due, and the effect of anticipating the payment has been to take the interest, or the use of the fund, if productive, from the residuary legatees who are entitled to it, and give it to the general legatees, who are not entitled to it. Suppose a bond or note of the testator, payable five years after his death, without interest,—the injustice of an immediate payment out of the proceeds of productive property, converted into money for that purpose, is too obvious for discussion. The executors must then, in my judgment, place the residuary legatees in the same plight and condition as if the general legacies had not been paid until they became due. On looking into the accounts, it appears 'that the executors, at the time of qualifying, were debtors to the estate in an amount sufficient to pay these legacies. Had that indebtedness continued, they would have been chargeable with interest. If it was in fact paid at the time of taking letters testamentary, the sum should have been deposited or kept separate; and if it was loaned, or paid to parties not entitled, interest should be charged. Under the circumstances, the executors being debtors to the estate in a sum more than sufficient to make the payment, and the legacies thus unwarrantably preferred being substantially, for the purposes of this question, payable to themselves, I must treat the fund as productive, and charge the executors with interest on the amount, until the expiration of one year after the letters testamentary were issued. (*Bradner* vs. *Faulkner*, 2 *Kernan*, 472.)

By the third clause of the will, the testator provided, as follows: "to my half sisters, Margaret and Bridget McLoskey, now sisters of the Academy of the Sisters of Charity, near Dubuque, in the State of Iowa, I bequeath six thousand dollars to each of them, to be invested in good State stock, and not transferable to the Academy, nor to any other institution, nor to any person or persons during their life." Margaret, one of the legatees, died before the testator, and I am of opinion that her legacy lapsed. There was not a bequest

to the two sisters in joint tenancy, but a specified sum was given to each in severalty, so that there is no possible ground for a survivorship. The words "to each," effect a separate gift as potently as if the benefactions were contained in different clauses of the will. The provision that the legacy should not be "transferable during life," would be utterly nugatory as a restriction upon absolute ownership, inconsistent with the previous bequest, were it not for the direction in regard to investment, which devolves a trust upon the executors. A restriction upon absolute ownership may be rejected as repugnant to the nature and incidents of the estate on which it is ingrafted, unless there be a valid limitation over, upon the occurrence of some designated event. (1 *Jarman on Wills*, 257, 784.) Where there is a trust, however, and a manifest intention to modify the mode of enjoyment, the court will strive to sustain the intent. I do not think that the testator intended to give only a life estate to these legatees. There is no disposition made of the fund after the death of the legatees, the gift itself is couched in as broad and unlimited terms as possible, and then follows the direction for investment, which implies that the property shall remain in the hands of the executors, and the donees shall receive only the income. But it is well settled that a gift of the income or produce of a fund, unaccompanied by words limiting the duration of the benefaction, confers an absolute estate, (*Elton* vs. *Sheppard*, 1 *Bro. C. C.* 532; *Philipps* vs. *Chamberlaine*, 4 *Vesey*, 53; *Rawlings* vs. *Jennings*, 13 *Vesey*, 39; *Adamson* vs. *Armitage*, 19 *Vesey*, 416; *Stretch* vs. *Watkins*, 1 *Madd.*, 253; *Clough* vs. *Wynne*, 2 *Madd.* 188.) So whatsoever way be taken, the same result is reached, the gift of the income is not limited as to duration, the gift of the sum itself is general, and the bequest is to be treated as designed to pass the entire property to the donees, subject to the proviso that it shall not be transferable during life. That is the only restraint upon the complete ownership, and it is not a qualification of the gift, but only a mode of enjoyment pointed out. The very fact that the power to transfer during life was excluded in

terms, is indicative of a power to transfer on death being intended. Certainly if the testator had supposed the legatees had only a life estate, he would not have established a restriction like this, for, from the nature of the case, a life-tenant has no power to transfer the principal fund. I think it was the intention that these ladies should not have any power while living, of controlling the property, that the income should always be secured to them, and, at the same time, they should possess a power of disposition on their decease. The decree, therefore, must provide for the investment by the executors, the payment of the income to the legatee, and of the principal on her death to her legal representatives.

It appears that the will, which has been presented to me for construction, was executed at Paris, in September, 1854, without such formalities as are requisite to a valid disposition of real property in the State of New York. I understood, upon the argument, that there is a previous will, made by the testator in July, 1852, still existing, which was executed according to the forms of our law. It will be proper, therefore, if that instrument has not been revoked, to have it offered for probate; and, if proved, it will control the disposition of the testator's lands in this jurisdiction.