Terpening *v.* Skinner.

———————

TERPENING and wife *vs.* SKINNER.

Where the language employed in a will is obscure or ambiguous, and words are made use of, in one connection, with a meaning apparently at variance with the sense of the same words in another clause, extrinsic circumstances may be resorted to, for the purpose of aiding the court in arriving at the intention of the testator.

Among these extrinsic circumstances, the situation of the testator's property, and the condition of his family, and especially of the apparent beneficiaries of his will, are to be considered, and are prominent land-marks to guide the courts in the duty of interpretation.

Where a will was inartificially and clumsily drawn; was prepared by a very unpracticed scrivener, who was poorly versed in the use of language as a medium of conveying ideas; several of its provisions were directly contradictory to each other; it did not, from the manner of its construction, appear to have been the result of much preconsideration; there was a great indefiniteness and uncertainty in the use of the word "heirs;" and there were other incongruities in the will, which tended to obscure its meaning; *Held,* that it was a proper case for resorting to evidence of the extrinsic and surrounding circumstances of the parties, to aid the court in the construction of the will.

APPEAL from a judgment entered upon the report of a referee. The action was in the nature of a bill for an accounting, and to compel the defendant, surviving executor of the will of Gersham Skinner, deceased, to make sale of certain real estate specified in the will. The plaintiff, Almira Terpening, the wife of the other plaintiff, Amos Terpening, claimed to be a devisee and legatee under the will of the testator, who was her grandfather. The will, which was executed May 4, 1822, was as follows:

"I, Gersham Skinner, of the town of Columbia, county of Herkimer, and state of New York, considering the uncertainty of this mortal life, and being of sound mind and memory—blessed be God for the same—do make and publish this my last will and testament, in manner and form following, that is to say: *First*. I give and bequeath unto my beloved wife Margaret Skinner, one third part of all that my certain farm, situated in the town of Columbia aforesaid; also one third of the barn, the west room of my dwelling house, together with the bedrooms, buttery, chamber and cellar of the the same; also all my household furniture, ironware dresser, dishes, and thirty dollars in money. I also order that John Skinner shall provide fuel for the use of my said wife during her lifetime, in full of the dower of my said wife. I further order, that at the death of my said wife, the lands bequeathed to her shall go to my son John Skinner and his heirs; and the furniture and other property bequeathed, at the death of my said wife, to be equally divided amongst my several daughters and their heirs. And I further order, that the sum of fifteen dollars shall be paid to my said wife in lieu of thirty dollars as heretofore mentioned. I further order, that Isaac Skinner shall have an equal share in my lands in the town of Verona, with my several daughters, instead of those mentioned in Columbia. *Secondly*. I give and bequeath unto my son. John Skinner, all that my certain farm, situated in the town of Columbia aforesaid, except what is heretofore conveyed. I also give and bequeath unto my said son John Skinner,

Terpening *v.* Skinner.

one wagon, one sleigh, one plow, one harrow, and one horse; and I order that said John Skinner shall pay to my several daughters, as hereinafter mentioned, that is to say: to Margaret Hess or her heirs the sum of twenty dollars, one half in one year and six months, and the remaining half in two years and six months after my decease; unto the heirs of Hannah Myers, late deceased, the sum of twenty dollars at the times last above mentioned, which said sum I order put at interest by my executors until said heirs arrive at lawful age; unto Caty Bloodgood the sum of forty dollars, to be paid at the times aforesaid, and which I order my executors to dispose of as they shall see best for the heirs of said Caty Bloodgood; unto Mary Hess the sum of twenty dollars, to be paid as aforesaid; and unto Amy Hess the sum of twenty dollars, at the times above mentioned. *Thirdly.* I give and bequeath unto my several daughters, Margaret Hess, the heirs of Hannah Myers, Caty Bloodgood, Mary Hess, Amy Hess, all my lands situated in the town of Verona, in the county of Oneida; also all my right to one other piece of land situated in the town of Columbia, whereon there is a saw-mill, being about sixteen acres, adjoining lands of William Gay and Conrad Hess, except that I order Isaac Skinner an equal share with my daughters in the aforesaid lands, except those in the town of Verona, which is to be divided solely amongst my daughters; and I order my executors to sell the above lands, as in their judgment they may see fit, and the money arising from the sales to be paid to my heirs aforesaid, except the heirs of Hannah Myers, to be placed at interest until they arrive at lawful age. I also order the money arising from the share of Caty Bloodgood to be retained by my executors, and by them applied for the benefit of the heirs of said Caty Bloodgood as they may think best. *Fourthly.* I give and bequeath unto my daughter Caty Bloodgood, one two year old heifer. *Fifthly.* I order all my personal property, not heretofore disposed of, divided equally amongst my heirs, after paying all my debts and funeral charges. *Lastly.* I hereby

appoint John Skinner and John Jones to be executors of this my last will and testament, hereby revoking all former wills by me made."

The testator died in March, 1824. The defendant proved the will, and took upon himself the office of executor, the other person named as executor refusing to act, and having died many years ago. The defendant was the son of the testator. Caty Bloodgood, the mother of the plaintiff, Almira Terpening, deemed herself entitled, under the will, to the rights now set up by the plaintiffs, or, at least during her life, interested in those rights. The defendant took the same view of the effect of the will, and acted accordingly. In the year 1857 the plaintiffs set up that Caty Bloodgood took nothing under the will, and that the defendant must account over to them. The referee gave to the will the construction contended for by the plaintiffs, and decided that the defendant must pay over to the plaintiffs, with interest, the entire share which had been supposed to belong to Caty Bloodgood, and which was many years ago accounted for to her. He also decided that the defendant must pay costs; and a judgment was entered, including costs, amounting to $973.61. Various exceptions were taken to rulings at the trial, as well as to the report of the referee. The defendant appealed.

*R. Conkling,* for the appellant.

*R. Earl,* for the plaintiffs.

*By the Court,* BACON, J. The result of this suit, and the propriety of the judgment rendered therein, depend entirely upon the construction which is to be given to the will of Gersham Skinner. Both the learned and capable referees by whom this cause has been tried, have given to it a construction which deprives a needy daughter who lived with the decedent on terms of entire friendliness and even affection, and who resided with and took care of him in his last illness, of

Terpening *v.* Skinner.

all interest in his estate, and of all share in his ample prop-
erty, except to the extent of one two-year old heifer, and passes
it over literally " to heirs he knew not whom," since the person
here claiming was not born until more than a year after the
making of the will.   Of such a construction it may be sus-
ceptible ; but to warrant it, the language ought to be pretty
clear and explicit, and the circumstances surrounding the
transaction such as to lead very strongly to the same conclusion.

In the construction of a will it need hardly be said, since the
rule is an elementary one, that the intention of the testator is
to govern, if consistent with the rules of law.   In arriving at
the intention it is also to be remarked, that it is to be ascer-
tained from the whole will taken together, and not from the
language of any particular clause or provision severed from
its connection and taken by itself; and in regard to the words
a testator has employed to convey his meaning, they must be
presumed to be used in their usual and primary sense, unless
from the context of the will it appears that the testator must
have used them in some other or secondary sense.   Where the
language employed is obscure or ambiguous, and words are
made use of in one connection with a meaning apparently at
variance with the sense of the same words in another clause,
extrinsic circumstances may be called to our aid in endeavor-
ing to arrive at the true intention of the testator ; and among
these the situation of the testator's property, and the condi-
tion of his family, and especially of the apparent beneficiaries
of his will, are to be considered, and are prominent land-marks
to guide the court in the duty of interpretation.

A glance at the will in question shows it to be not only
inartificially, but most clumsily drawn.   It was prepared, as the
testimony discloses, by an old man by the name of John Jones,
who was evidently not only a very unpracticed scrivener, but
very poorly versed in the use of language as a medium of con-
veying ideas.   Several of the provisions of the will, also, are
entirely contradictory to each other ; and it does not from the
manner of its construction appear to have been the result of

much preconsideration, but to have been dictated if not written " *currente calamo.*" Thus, in the very first clause, the testator gives his wife one third of his farm and of his barn, and then orders his son to provide her fuel during her lifetime in lieu of dower. He gives her $30 in money, but before he finishes the clause he orders that $15 be paid to her in lieu of the $30. He directs in this clause that Isaac Skinner shall have an equal share with his daughters in his lands in Verona, instead of those in Columbia; and in the third clause of the will he directs that the same Isaac Skinner shall have an equal share with his daughters in his aforesaid lands, " except those in the town of Verona." Thus, while seeming in both instances to be carefully looking after Isaac's interests, totally cutting him off from any share in his estate.

In the use of the word " heirs," throughout the will, the like indefiniteness and uncertainty prevails. In one part of the will it clearly means the testator's own children; in another it is used to designate the issue of his children, and in another it may mean any person, no matter in what relation they stood to the testator, who might by the rules of law inherit from his children.

There are some other incongruities in the will which tend to obscure its meaning, but which need not be particularly specified; since enough already appears to show that this is a case where the extrinsic and surrounding circumstances of the parties are very properly invoked to aid us in its construction.

The testator, besides his son, the defendant, who was his principal devisee, had four married daughters at the time of the making of his will, and one daughter had deceased, leaving several children. For all these the will indicates that he intended to make provision; the children of his deceased daughter representing their parent, and receiving the same portion with the living daughters of the testator, except that their shares were not to be paid until they should respectively arrive at age. But among those daughters there was a remarkable discrimination. The three living daughters, Margaret

Hess, Mary Hess and Amy Hess, and the children of Hannah Myers, his deceased daughter, were to be paid the sum of $20 at certain periods after the testator's death, but to his daughter Caty Bloodgood the sum of $40 was to be paid at the same periods. They were all to share equally in his lands in Verona and Columbia, except that portion which had been devised to the defendant, as well as in his personal property not otherwise disposed of, and over and above what was bestowed upon the others, by a separate clause, a heifer was bequeathed to Caty Bloodgood. These discriminations are, it is true, slight in amount, but they seem to indicate very clearly that the daughter Caty was selected as an object, to some extent at least, of a benefaction beyond her sisters. The key to this, and which will help us to unlock the other passages of the will, will doubtless be found in the condition of Caty in her social relations, and as a member of her father's household. In the latter capacity, as has already been remarked, she was on terms of kindness and affection with her aged father, and aided in nursing and attending upon him in his last illness and until his death, which occurred in less than two years after making the will in question. She was married to one Samuel Bloodgood, while living at her father's house, and continued to reside there with him until the death of Bloodgood, which occurred a little over two years after the marriage, and between the making of the will and the death of the testator. Very soon after the marriage with Bloodgood, and some time before the date of the will, Bloodgood exhibited such evidence of insanity as to occasion great anxiety on the part of his wife and of the family; so that in the language of one of the witnesses, after an incident which he describes as occurring before the time the will bears date, " we had to watch him close, had to hide knives and forks to keep him from destroying himself and family." This state of things continued, and excited continual alarm, until in the month of July, 1823, he evaded the watch which had been kept upon him, and terminated his life by violence. Such a state of things as this would

naturally beget a desire on the part of a kind father to favor his unfortunate daughter, thus haunted with the perpetual apparition of a "skeleton in her house," and to put his intended bounty in such a position that it would most benefit her, and any family she might leave, and not be subjected to the power or caprice of an insane man.

With this state of things in view, the language of the will becomes comparatively plain, and the interpretation, to my mind, is quite obvious. If the construction for which the plaintiff contended is to prevail, the daughter whose condition demanded the most sympathy, and whose wants required the most aid, is to be much worse off than her sisters who do not appear to have been in any particular necessity, nor to have been objects of special favor. What reason can be given to authorize us to conclude that a father should thus discriminate, not in favor of but against a dutiful daughter, whose condition was more precarious than that of her sisters, and cut her off in her own person from any share in his estate ? To warrant this the language should be clear and emphatic, leaving no room for any other construction.

But the words of this will not only do not require this unnatural construction, but are entirely consistent with the interpretation which all the parties had given to them until this suit was instituted, and under which they have acted for more than thirty years.

As to the legacy of $40, the language used is the same as that employed in the bequest to the other daughters, of their legacies of $20 each. It is, " I order John Skinner to pay to my several daughters as hereinafter named as follows." Then follow the bequests to Margaret Hess, or her heirs, the sum of $20, one half in a year and six months, and the remaining half in two years and six months from his decease; "unto Caty Bloodgood the sum of $40, to be paid at the times aforesaid;" and then it is added, " which I order my executors to dispose of as they shall see best for the heirs of said Caty." The object of this limitation, if such it can be called, was

Terpening *v.* Skinner.

obviously to keep the money from falling into the hands of Bloodgood, and to insure its expenditure for the benefit of Caty and her family. If it was best for the family that it should be paid at once to Caty, such payment might be, and indeed was, ordered to be made, the only object being to give the executor a check, if necessary, upon its disbursement. The same limitation occurs in the third clause, devising to his daughters his real estate; and I am persuaded it was to secure the same end, having the like circumstances in view.

The words of conveyance of the estate are precisely the same in reference to all the daughters. If Caty takes no estate, they take none. But this has not been pretended, and cannot be, with any show of plausibility. The subsequent direction as to a sale and division of the proceeds of the land, would not affect the question of the vesting of the estate. That was a matter left to the discretion of the executors; but if they sold, the share of Caty was to be applied for the benefit of the heirs of Caty, " as they should think best." If, in their judgment, it was for the benefit of the heirs to pay it to Caty, they were at liberty to do so. In point of fact, as the case discloses, the whole amount which the share of Caty in the Verona lands produced, was paid over to the plaintiffs in 1844, so that the instruction in the will would appear to have been strictly complied with. But whether it has or not, is not at all important in this suit. If the defendant has not fairly and honestly discharged his trust, he may be called to account by Caty Bloodgood, who is still living, and is the proper if not the only party who can be heard on that subject. This suit, and the report of the referee, has, in my judgment, proceeded upon a radical misconstruction of the will, giving to the plaintiffs rights and remedies to which they are in no respect entitled.

The result is that the judgment must be set aside and a new trial granted, with costs to abide the event.

[ONONDAGA GENERAL TERM, October 4, 1859. *Pratt, Bacon, W. F. Allen and Mullin,* Justices.]