NEW YORK COUNTY.—HON. D. G., ROLLINS, SURROGATE.—October, 1887.

MATTER OF HASTINGS.

*In the matter of the estate of* HUGH J. HASTINGS, *deceased.*

Where a testator, in indicating, in his will, the subject of a bequest, uses words which aptly describe property found by the executors among his assets, and are, also, aptly descriptive of property which the latter may purchase without recourse to his estate, the bequest may properly be treated as general.  *Contra,* where such subject is a thing which the testator alone possesses.

Testator's will contained a clause whereby he gave and bequeathed, to one nephew " twenty shares of the capital stock of the C. association; " to another nephew ten, and to each of three others five, shares of the same stock, *totidem verbis.*  Forty-five shares of the stock described were found among his assets and duly transferred to the legatees.  Previously to the transfers, dividends, earned in testator's lifetime, were declared upon the stock of the association, the share whereof, belonging to testator's estate, came to the hands of the executors; upon the settlement of whose account, the residuary legatee insisted that the bequests of stock were general, and had been fully satisfied by the transfers mentioned, it being contended, on the other hand, that the dispositions were specific, and carried the dividends.—

*Held,* that, upon the face of the will, alone, the legacies appeared to be general in their character; but that extrinsic evidence was admissible to show the relation sustained by the testator and his estate towards the subject thereof.

It appearing by such evidence, when introduced, that, at the time of the

execution of the will, it was true, and testator knew, that he alone owned a sufficient number of shares of the stock described to satisfy the bequests,—a like number thereof, other than his own, not being in existence;—and that during the period expiring at his death he not only parted with none of these shares but acquired others,—

*Held,* that these facts were inconsistent with any interpretation of the will other than one involving an intention on testator's part to bestow, specifically, a portion of the very stock which he owned at the time of his death, and that the legatees of the stock took their ratable shares of the dividends, as the increment of specific legacies.

Tifft v. Porter, 8 *N. Y.*, 516—distinguished.

CONSTRUCTION of will upon judicial settlement of accounts of executors of decedent's will. The facts are stated in the opinion.

KNEVALS & RANSOM, *for residuary legatee.*

ROSCOE CONKLING, W. K. GRIFFIN, *and* CRANE & LOCKWOOD, *for other legatees.*

THE SURROGATE.—This testator died in September, 1883, leaving a will, that he had executed in January, 1882, whereby he appointed John Hastings, Beverly Ward and Jenkins Van Schaick as his executors. This will was admitted to probate in October, 1883. It contains the following provision:

"I give and bequeath unto my nephew John Hastings son of John Hastings, twenty shares of the capital stock of the Commercial Advertiser Association, and to my nephew Hugh Hastings ten shares of said capital stock, and to my nephew Schoolcraft Hastings five shares of said capital stock, and to my nephew William Hastings five shares of said capital stock, and to my nephew John Hastings son of Richard Hastings five shares of said capital stock."

Executor Van Schaick filed an account of his ad-

ministration in November, 1884; a separate account was subsequently filed by his two associates. Both these accounts were judicially settled by a decree entered in June, 1885, but by that decree the question upon which I am now to pass was reserved for after-determination.

It appears, by these accounts, that the testator was possessed, at his death, of certain shares of stock, of the very sort specified in the bequests above referred to, and that, in May, 1884, forty-five of such shares were transferred to the aforesaid legatees. Before such transfer was effected, certain dividends were declared upon the capital stock of the Commercial Advertiser Association, and the share of the testator's estate therein came to the hands of his executors. These dividends had been earned during the testator's lifetime. The dividends upon forty-five shares are still undistributed. The executors are not agreed as to the proper distribution of the same, and have, therefore, submitted the matter for the determination of the Surrogate.

It is claimed by counsel for the residuary legatee, that the bequests in question are general legacies, and were fully satisfied by the transfer of the stock; the transferees, as they insist, have no interest in the dividends, and such dividends should be treated as part of the residuary estate.

It is claimed, on the other hand, by opposing counsel, that the bequests to their clients must be regarded as bequests of a portion of the very stock owned by the testator himself in his lifetime, and that, of a consequence, the legatees of such stock are entitled to

the dividends earned thereon before the testator's death.

Of these two contentions, the former must certainly prevail, if, in ascertaining the character of the bequests in question, the court is confined strictly to the terms of the will, and is not at liberty to resort to any extraneous evidence for the interpretation of its provisions. There is nothing upon the face of that paper to show what were the objects and purposes of the Commercial Advertiser Association; what connection, if any, the decedent had therewith at the time of making his will, and theretofore, and thereafter, and at the time of his death; how many shares, if any, of the capital stock of such association he owned at the date of his will; what was the total number of shares thereof at that time, and at the time he died; whether or not it has been possible for the executors to satisfy the legacies here in controversy without recourse to the very shares whereof their testator died possessed. The will contains no description of the stock bequeathed; the testator does not refer to it as "my" stock, nor has he in any other manner expressly indicated to his executors his wish, that, in the satisfaction of these legacies, resort should be had to any of the identical shares which might form a part of his estate at his decease.

Now there are numerous decisions holding that such bequests, as these appear to be on the face of the will, are not specific but general, and that the mere circumstance that a testator's executors have found among the assets of his estate property precisely answering to the description of property so bequeathed,

does not suffice of itself to give such bequests the quality of specific legacies (Tifft v. Porter, 8 N. Y., 516 ; Robinson v. Addison, 2 *Beav.*, 515 ; Bronsdon v. Winter, *Ambler*, 57 ; Sibley v. Perry, 7 *Ves.*, 523 ; Davis v. Cain, 1 *Ired. Eq.*, 304 ; Gilmer v. Gilmer, 42 *Ala.*, 9 ; Corbin v. Mills, 19 *Grat.*, 438 ; Dryden v. Owings, 49 *Md.*, 356).

But it is insisted, by counsel for these legatees, that it is the duty of the Surrogate to consider certain extrinsic evidence which they have introduced (under objection and subject to a motion to strike out), which evidence, as they claim, shows a clear purpose of the testator to stamp these bequests with the character of specific legacies.    The nature of the evidence in question is to the effect following :

That, at the date of the will, and at the date of its maker's death, the Commercial Advertiser Association was a corporation organized under the laws of this State ; that the capital stock of such corporation had, from its creation, consisted of 144 shares, of the par value of $100 each ; that of these shares the testator, at the date of his will, was the owner of 111 ; that this continued to be substantially the state of affairs until the time of his death, except that he had, in the interval, acquired, jointly with another, the ownership of fifteen shares additional ; that, at no time after the execution of his will, would it have been possible, in the event of his death, to have obtained forty-five of such shares outside the assets of his estate ; that, for several years before he died, no dividends had been declared upon such stock ; that there had accumulated thereon certain profits, from which, about two months

after his death, the trustees of the corporation declared a dividend of $250 per share.

I understand that counsel for the residuary legatee concede that, in substance, the foregoing propositions are true, though they have reserved the right to offer testimony as to the matters therein stated, in case the Surrogate shall find such testimony competent and material.

Is the evidence heretofore received under objection admissible, and, if so, does that evidence suffice to invest the bequests to the testator's nephews with the properties of specific legacies?

One of the early cases, touching the distinction between general and specific legacies, is that of Ashburner v. Macguire (2 *Bro. C. C.*, 108) which was decided by Lord Chancellor THURLOW, in 1786. When I recall what a multitude of judicial decisions I have, from time to time, examined in the investigation of the matter here to be passed upon, and consider how full of bewildering refinements and contradictions those decisions are, I can understand why Lord THURLOW held Ashburner v. Macguire under advisement for two years, and why I may visibly be pardoned for dealing in like hesitating fashion with the case at bar.

In opposing the consideration of extrinsic evidence herein, counsel for the residuary legatee invoke the familiar principle, thus formulated by Mr. Jarman in his Treatise on Wills, vol. 1, p. 409: "As the law requires a will to be in writing, it cannot, consistently with this doctrine, permit parol evidence to be adduced, either to contradict, add to or explain the contents of such will; and the principle of this rule

evidently demands an inflexible adherence to it, even where the consequence is the partial or total failure of the testator's intended disposition; for it would have been of little avail to require that a will *ab origine* should be in writing, or to fence a testator round with a guard of attesting witnesses if, when the written instrument failed to make a full and explicit disclosure of his scheme of dispositions, its deficiencies might be supplied or its inaccuracies corrected from extrinsic sources." The doctrine thus enunciated has been repeatedly asserted by the courts (King v. Badeley, 3 *Myl. & K.*, 417; Mann v. Mann, 1 *Johns. Ch.*, 231; affi'd, 14 *Johns.*, 1; Taylor v. Wendel, 4 *Bradf.*, 334; Jackson v. Sill, 11 *Johns.*, 201; Bunner v. Storm, 1 *Sandf. Ch.*, 357; Jenkins v. Van Schaack, 3 *Paige*, 242; Sponsler's Appeal, 107 *Penn. St.*, 95).

Mr. Jarman somewhat qualifies this doctrine, in the following proposition, which is supported by numerous decisions: "Though it is the will itself, and not the intention as elsewhere collected, which constitutes the real and only subject *to be expounded,* yet in performing this office a court of construction is not bound to shut its eyes to the state of facts under which the will was made; on the contrary, an investigation of such facts often materially aids in elucidating the scheme of disposition which occupied the mind of the testator. To this end, it is obviously essential that the judicial expositor should place himself as fully as possible in the situation of the person whose language he has to interpret."

Vice Chancellor WIGRAM, in the introduction to his treatise on "Extrinsic evidence in Aid of the Interpre-

tation of Wills," says: "The question just suggested" (that is the question under what circumstances the admission of extrinsic evidence in aid of the exposition of wills is allowed) "has become much perplexed by want of proper attention on the part both of the courts and of the text writers, to the different purposes to which the admissibility of extrinsic evidence may be applied, and to the different nature of the evidence, which, with reference to such different purposes, parties have tendered for admission. It is said, and correctly, that the statute, by requiring a will to be in writing, precludes a court of law from ascribing to a testator any intention which his written will does not express, and, in fact, makes the writing the only legitimate evidence of the testator's intention. . . . . . At the same time, however, courts of law, though precluded from ascribing to a testator any intention not expressed in his will, admit their obligation to give effect to every intention which the will, properly expounded, contains. The answer, therefore, to the question above proposed, enjoined as well as sanctioned by the general principle above mentioned, must be that any evidence is admissible which in its nature and effect *simply explains what the testator has written*; but no evidence can be admissible which in its nature or effect is applicable to the purposes of showing merely what he intended to write. In other words, the question, in expounding a will, is not what the testator meant as distinguished from what his words expressed, but simply, what is the meaning of the words. And extrinsic evidence in aid of the exposi-

tion of his will must be admissible with reference to its bearing upon an issue which this question raises."

The learned author further points out the distinction between evidence that is simply explanatory of the words of a will, and evidence by which intention itself is sought to be proved as an independent fact.   His "Fifth proposition" (p. 56, 2d Am. ed.) is as follows: "To determine the object of a testator's bounty, or the subject of disposition, or the quantity of interest intended to be given by his will, the court may inquire into every material fact, relating to the person who claims to be interested under the will, and to the property which is claimed as the subject of disposition, and to the circumstances of the testator and his family and affairs. . . . . The same, it is conceived, is true of every other disputed point, respecting which it can be shown that a knowledge of extrinsic facts can in any way be made ancillary to the right interpretation of a testator's words."

Judge TAYLOR says, in his "Treatise on Evidence" (8th ed., § 1158): "Although extrinsic parol evidence contradicting, varying, adding to or subtracting from the contents of a written instrument is inadmissible, . . . . . . still parol evidence may in all cases of doubt be adduced to explain the written instrument, or, in other words, to enable the court to discover the meaning of the terms employed and to apply them to the facts.   The doubt here adverted to may arise from one or both of the two following causes: Either the language of the instrument may be unintelligible to the court, or, at least be susceptible of two or more

meanings; or the persons or things mentioned may require to be identified."

Again, at § 1194 : "It may be laid down as a broad and distinct rule of law, that extrinsic evidence of every material fact, which will enable the court to ascertain the nature and qualities of the subject-matter of the instrument, or, in other words, to identify the persons or things to which the instrument refers, must of necessity be received. Whatever be the nature of the document under review, the object is to discover the intention of the writer as evidenced by the words he has used ; and in order to do this, the judge must put himself in the writer's place, and then see how the terms of the instrument affect the property or subject-matter. With this view, extrinsic evidence must be admissible of all circumstances surrounding the author of the instrument. In the simplest case that can be put—namely, of an instrument appearing on its face to be perfectly intelligible— *inquiry must be made for a subject-matter to satisfy the description.*"

And yet again, at § 1195 : "If the court has to determine whether a bequest of stock is specific or pecuniary, it will not only look to the context of the will, and the terms of the gift, but it will also receive evidence of the state of the testator's funded property." All this, of course, subject, as the author declares at § 1201, to the rule that—"Though evidence of circumstances surrounding the author of a written instrument will be received for the purposes of ascertaining his intentions, yet these intentions must ultimately be determined by the *language* of the in-

strument as explained by the extrinsic evidence; and no proof, however conclusive in its nature, can be admitted with a view to set up an intention inconsistent with the known meaning of the writing itself."

Mr. Spence says, upon this subject, in his "Equitable Jurisdiction" (vol. 1, p. 356): "It is to be observed that in relation to the *subject* of every gift or transfer and the person who is the *object* of the gift or transfer, the words used must be symbols of something extrinsic to the instrument; we must therefore *in all cases* institute an inquiry beyond the instrument in order to ascertain what is meant by the words used." . . . . Where the state of the property will show in what sense the testator has used the words to be found in his will resort may in some cases be had to evidence directed to that point; thus the state of a testator's funded property may be resorted to in order to show whether a bequest of stock is pecuniary or specific."

Now the executors who are here accounting must, of necessity, look outside the will to find what the testator means by capital stock of the Commercial Advertiser Association, and not until they have somewhere found the subject-matter with which his bequests deal, can they satisfy the requirements of the will by turning over those bequests to the legatees. If the introduction of extrinsic evidence in this regard would not only create a doubt as to the character of the legacies where no doubt had existed before, but would also dispel that very doubt by establishing that the legacies must have been intended

as specific and not general, it seems to me that such evidence must be pronounced competent and material.

Many of the older decisions and some of a recent date hold, that in cases like the present parol evidence is only admissible in cases of latent as contrasted with patent ambiguity. This artificial distinction is thus enunciated by Lord Bacon (Rules & Maxims, Regula 23): "*Ambiguitas patens* is that which appears to be ambiguous upon the deed or instrument; *latens* is that which seemeth certain and without ambiguity for anything that appeareth upon the deed or instrument, but there is some collateral matter out of the deed that breedeth the ambiguity." This definition of Lord Bacon's is cited by Mr. TAYLOR "more," as he says, "out of respect to that great man than in the expectation that it will afford much practical information." And Judge STORY declared, over seventy years ago, in Peisch v. Dickson (1 *Mason*, 9), that he had endeavored in vain to reconcile the conflicting authorities as to latent and patent ambiguity.

Even if we apply to the present case, however, the strictest tests, it can be claimed with much force that there is here an "*ambiguitas latens*" (Boys v. Williams, 2 *Russ. & M.*, 689 ; Hyatt v. Pugsley, 23 *Barb.*, 286, 297). For it is the extrinsic evidence, and that alone, which leads to the discovery that, if the testator's death had occurred on any of all the days between the day he executed his will and the day when he in fact died, the legacies to his nephews could only have been satisfied by recourse to the very stock of which he had himself been uninterruptedly the exclusive owner.

Upon the authority of the cases below cited I have concluded that it is proper to receive evidence of the nature and extent of this testator's estate, and of the circumstances under which he made his will, as an aid in the interpretation of the provisions of that instrument which are here the subject of controversy.*

SECOND. Having determined that the evidence whose competency is here in dispute must stand, the question next arises whether it suffices to impress upon these bequests of stock the character of specific legacies. [It may be said, in passing, that, if this testator, by the terms of his will as interpreted in the light of extrinsic circumstances, must be held to have virtually instructed his executors to satisfy these stock legacies, after his death, *out of* the very shares of which he

---

* Doe v. Hiscocks, 5 *M. & W.*, 363; Abbott v. Middleton, 7 *H. L. Cas.*, 68, 93; Adamson v. Ayres, 5 *N. J. Eq.*, 349, 353; Allgood v. Blake, *L. R.*, 8 *Ex.*, 160; Ashton v. Ashton, *Cas. Tem. Tal.*, 152; Att. Gen. v. Drummond, 1 *Dr. & War.*, 353, 367; Att. Gen. v. Grote, 2 *Rus. & M.*, 699; Avelyn v. Ward, 1 *Ves. Sr.*, 420; Baugh v. Read, 1 *Ves.*, 257; Bond's Appeal, 31 *Conn.*, 183; Boys v. Williams, 2 *Rus. & M.*, 689; Bradley v. Wash., etc., Co., 13 *Peters*, 89; Brownfield v. Brownfield, 20 *Penn., St.* 55; Colpoys v. Colpoys, *Jacobs*, 451; DeNottebeck v. Astor, 13 *N. Y.*, 98; Doe v. Huthwaite, 3 *Bar. & Ald.*, 633; Doe v. Martin, 1 *Nev. & Man.*, 512, 524; Doe v. Roe, 1 *Wend.*, 541; Druce v. Denison, 6 *Ves.*, 385; Earp's Will, 1 *Parsons [Penn.]*, 453; Fish v. Hubbard, 21 *Wend.*, 651; Fonnereau v. Poyntz, 1 *Bro. C. C.*, 472; Gallini v. Noble, 3 *Mer.*, 691; Gannaway v. Tarpley, 1 *Cold. [Tenn.]*, 572; Gilmer v. Gilmer, 42 *Ala.*, 9; Goodhue v. Clark, 37 *N. H.*, 525; Goodtitle v. Southern, 1 *M. & S.*, 299; Grey v. Pearson, 6 *H. L. Cas.*, 61, 106; Guy v. Sharp, 1 *Myl. & K.*, 589, 602; Hampshire v. Peirce, 2 *Ves. Sr.*, 216; Heming v. Whittam, 2 *Sim.*, 493; Hewson v. Reed, 5 *Madd.*, 451; Hill v. Crook, *L. R.*, 6 *E & I. App.*, 265, 277; Hoyt v. Hoyt, 85 *N. Y.*, 142; Hyatt v. Pugsley, 23 *Barb.*, 286, 297; Innes v. Johnson, 4 *Ves.*, 569; Innes v. Sayer, 3 *Mac. & G.*, 606; Jeacock v. Falkener, 1 *Bro. C. C.*, 296; Kunkel v. MacGill, 56 *Md.*, 120;

should die possessed and no others, such legacies must be pronounced specific, though they are not distinctly identified in the will either by certificate numbers or otherwise (Nelson v. Carter, 5 *Sim.*, 530; Oliver v. Oliver, *L. R.*, 11 *Eq.*, 506 ; Drinkwater v. Falconer, 2 *Ves. Sr.*, 623 ; Morley v. Bird, 3 *Ves.*, 628 ;* Mullins v. Smith, 1 *Dr. & Sm.*, 204; Badrick v. Stevens, 3 *B. C. C.*, 431).]

Upon this question, I shall refer in some detail to several reported decisions. The will which was the subject of construction in De Nottebeck v. Astor (13 *N. Y.*, 98) contained this provision : "I give to the six children of my daughter $100,000 of the public debt called the Water Loan, to be paid *to each* on attaining their age of twenty-one years." This was declared to be a bequest of $100,000 to the six chil-

Lefevre v. Lefevre, 59 *N. Y.*, 434, 443; Leigh v. Leigh, 15 *Ves.*, 92; Lowe v. Huntingtower, 4 *Russ.*, 532; McCorn v. McCorn, 30 *Hun*, 171; 100 *N. Y.*, 511; Martin v. Drinkwater, 2 *Beav.*, 215; Metcalf v. Framingham, 128 *Mass.*, 370; Morton v. Perry, 1 *Metc.*, 446; Norris v. Thomson, 16 *N. J. Eq.*, 542; Page v. Young, *L. R.*, 19 *Eq.*, 501, 506; Penticost v. Ley, 2 *Jac. & W.* 207; Perry v. Hunter, 2 *R. I.*, 80; Postlethwaite's Appeal, 68 *Penn. St.*, 477; Pierrepont v. Edwards, 25 *N. Y.*, 128; Robinson v. Addison, 2 *Beav.*, 515; Rom. Cath. Orph. As. v. Emmons, 3 *Bradf.*, 144; Roseboom v. Roseboom, 81 *N. Y.*, 356; Ryerss v. Wheeler, 22 *Wend.*, 148; Sargent v. Towne, 10 *Mass.*, 303; Shelton v. Shelton, 1 *Wash.* [*Va.*], 53; Sherwood v. Sherwood, 45 *Wisc.*, 357; Shore v. Wilson, 9 *Cl. & Fin.*, 355, 356, 366; Smith v. Burch, 92 *N. Y.*, 228; Smith v. Jersey, 2 *Br. & Bi.*, 473, 553; Snyder v. Warbasse, 3 *Stock.*, 463; Spencer v. Higgins, 22 *Conn.*, 521; Stringer v. Gardiner, 27 *Beav.*, 35; Stevenson v. Druley, 4 *Ind.*, 519; Templeman v. Martin, 4 *B. & Ad.*, 771, 785; Terpening v. Skinner, 30 *Barb.*, 373; 29 *N. Y.*, 505; Tillotson v. Race, 22 *N. Y.*, 122; Webber v. Stanley, 16 *Com. Bench, N. S.*, 698; White v. Hicks, 33 *N. Y.*, 383; Hutton v. Benkard, 92 *N. Y.*, 295; Woods v. Woods, 2 *Jones Eq.*, *N. C.*, 420; Wootton v. Redd, 12 *Grat.*, 196, 205.

dren collectively, and not a bequest of that amount to each of them. In pronouncing the opinion of the Court of Appeals, DENIO, J., while admitting that the verbal construction of the provision seemed to favor the latter interpretation, found argument for the former in the fact that the testator was not possessed of anything like the amount of stock which would be necessary to satisfy the bequest in question as construed by the plaintiff. The learned judge dwelt, also, upon the fact that, in every instance where the testator had bequeathed funded securities, he was the owner of an amount of such stock equal to the sums bequeathed. " To my mind," he declared, " this is satisfactory evidence of the existence of a relation in the mind of the testator between the stocks which he owned and those which he bequeathed, and of a general intention to give only what he at that time had."

In White v. Hicks (33 *N. Y.*, 383), there appeared, upon the face of a will, a doubt whether its maker had undertaken to dispose of property touching which he had a power of testamentary appointment. It was held that the court was at liberty to compare the dispositions of the will with the state of the testator's own property, and to deduce therefrom an inference of his intention to embrace in his testamentary gifts the property whereof he was entitled to make disposition under the power. The doctrine of the case last cited was lately reasserted by our Court of Appeals, in Hutton v. Benkard (92 *N. Y.*, 295, 301), in these words: " When a will," says EARL, J., " is claimed to be effectual as an execution of a power, all parts of it may be considered and its language and terms con-

strued in the light of circumstances surrounding the
testator at the time of its execution; and if, from all
this it can be seen that it was his intention to execute
the power, such intention will have effect."

The New Jersey Court of Errors and Appeals, in
Norris v. Thomson (16 *N. J., Eq.*, 542), held that cer-
tain legacies were specific, upon the following state
of facts: A testator gave to his executors, in trust,
750 shares of the capital stock of N. Y. and Baltimore
Transportation Line, for the benefit of certain bene-
ficiaries. He also gave to certain trustees five bonds,
of $1,000, each, of the Delaware and Raritan Canal
Co. He did not refer to the stock or bonds as his
own, or in any other mode declare, upon the face of
his will, that the bequests were to be satisfied *in specie*
out of his estate. The court said that, as it appeared
by the terms of the will, as construed in the light of
extrinsic evidence as to the state of the testator's pro-
perty, that he intended the legacies to be specific,
they must be pronounced specific. The rule, that the
testator's adjudged intention must be ascertained by
the words of his will, was declared to be "not a tech-
nical arbitrary rule to be answered only by the use of
particular words and expressions," but to be rather
" the embodiment of the general principles by which
the character of legacies should be tested and deter-
mined; each will resting for correct construction upon
the language employed, and *established surrounding
significant circumstances if such exist."*

The opinion of VAN DYKE, J., in this same case, is
reported in 15 *N. J., Eq.*, 493. He says: " Another
rule, admitted to be universal, is always to be resort-

ed to in solving these difficult questions, and that is, what was the real intention of the testator. This, if it can be ascertained, is always to govern. In the case before us, if we take the will itself, *together with such other evidence and circumstances as we are permitted to consider*, it seems impossible to conclude that the testator intended these to be general legacies. . . . . *But we need only add the fact of the possession of these stocks and bonds by the testator at the time of making the will, and thence to the time of his death, to the language of the will itself, to ascertain the intention of the testator.*"

In McCorn v. McCorn (30 *Hun*, 171 ; affi'd, 100 *N. Y.*, 511), it was held that, in determining whether a legacy was or was not a charge upon the testator's estate, " extrinsic facts " and " surrounding circumstances " could properly be taken into account. FINCH, J., in pronouncing the opinion of the court of last resort, dwelt upon the fact that a construction by which the legacies should be treated as not charged upon the real estate would involve a notion, which the court was unwilling to entertain, " that the testator, in making his last will, under the solemnity of approaching death, indulged in bequests known to be useless and vain."

The testator whose will was under consideration in Kunkel v. MacGill (56 *Md.*, 120), bequeathed to his daughter, among other things, " $5,000 of the Wilmington, Columbia and Augusta R. R. Bonds." His will was executed thirteen days before his death. Among his effects, were found five bonds of the kind bequeathed, each of the face value of $1,000. Evi

dence was introduced showing that the market value of these bonds was about thirty cents on the dollar. It was contended by the legatee that the bequest in her favor was a bequest of $5,000 in money, with the bonds demonstrated as the fund primarily charged with its payment, or as a bequest of $5,000 worth of such bonds, with direction to the executors to purchase the same for the legatee.   The court, after referring to the inclination of judicial tribunals to construe legacies as general, said : " But, however strong may be the inclination, and into whatever refinements this course of judicial decision may have led, all the cases agree that the governing principle in this, as in all other questions upon the construction of wills, is the testator's intention."   The court then reviewed the will as a whole, and discovered therefrom, and from the state of the testator's property, an intention on his part to make the legacy of bonds specific.

In  Colpoys v. Colpoys (*Jacobs,* 451), it appeared that a testator had bequeathed to each of certain persons " an annuity of £—— long annuities," and to each of divers other persons " £—— long annuities," and the court was called upon to decide whether the latter class of legatees were entitled to long annuities or only to sums of sterling money.   In holding to the latter interpretation, great importance was attached to the fact that the whole fortune of the testatrix bore but a small proportion to the value of the bequests in question, if considered as bequests of " long annuities."   In commenting upon the question how far that circumstance should be regarded as controlling, the court (Sir THOMAS PLUMER, M. R.) says (p. 463):

" The admission of extrinsic circumstances to govern the construction of a written instrument is in all cases an exception to the general rule of law which excludes everything *dehors* the instrument. It is only from necessity, and then with great jealousy and caution, that courts, either of law or equity, will suffer this rule to be departed from. It must be the case of an ambiguity which cannot otherwise be removed, and which may, by these means, be clearly and satisfactorily explained. . . . . In the case of a patent ambiguity, as a general rule a reference to matters *dehors* the instrument is forbidden. It must if possible be removed by construction and not by averment. But in many cases this is impracticable, as where the instrument furnishes no materials by which the ambiguity thus arising can be removed. If in such cases the court were to reject the only mode by which the meaning could be ascertained, viz. : the resort to extrinsic circumstances, the instrument must become inoperative and void. As a minor evil, therefore, common sense and the law of England (which are seldom at variance) warrant the departure from the general rule and call in the light of extrinsic evidence. The books are full of instances sanctioned by the highest authorities both in law and equity."

This language is followed by an approving reference to Doe, dem. Jersey, v. Smith (2 *Brod. & Bing.*, 553), and to the principle therein stated by BAYLEY, J., as follows : " The evidence here is not to produce a construction against the direct and natural meaning of the words : not to control a provision, distinct and accurately described. . . . . I look to the state of the

property at the time, to the estate and interest the settlor had and the situation in which she stood with regard to the property she was settling to see whether that estate or interest or situation would assist us in judging what was her meaning."

Innes v. Johnson (4 *Ves.*, 568) was a case in which a testator had given his sister " the full interest of £300 upon bond during her life," and to her daughter at her mother's death " all the interest that shall fairly and justly be due upon the *said* bond," etc., together with the principal. The testator left one bond for £300 and several other bonds in various other sums. It was held by the Master of the Rolls that these legacies were specific. Some stress was laid upon the word " said," above italicised, as pointing to this construction, but there is a distinct and positive intimation that even in the absence of that word the court would have reached the same conclusion in case it had appeared that the testator " had only one bond in the world," and that such bond was one of the particular amount bequeathed.

Ashton v. Ashton (*Cas. tem. Tal.*, 152) is a case in which a testator had bequeathed to his nephew £6,000, South Sea annuities upon trust, with directions for conversion of the same into money, and for the devotion of the proceeds to purchase of lands to be settled on such nephew for life. The testator left a considerable personal estate, but was shown to have had only £5,360 annuities at the time he made his will. *Held*, that the bequest was specific, apparently upon the ground that it would be absurd to suppose that the testator could have had in mind the purchase by

his executors of annuities that they would be required to sell again for buying lands, and that, therefore, it must have been his intention to give only the South Sea annuities of which he was possessed. Reference was made, in the early part of this decision, to the case of Bronsdon v. Winter (*Amb.*, 56). It was a case in which a testator had made a bequest of "2,000*l* capital stock in the South Sea Company." At the date of his will he was possessed of precisely 2,000*l* in that species of stock and of no more. He sold some portion of this before his death. It was held that the legacy was general and that it had not become adeemed by such sale. In commenting upon this decision, MALINS, V. C., in Page v. Young (*L. R.*, 19 *Eq.*, 501), says: "The representation was made in that case that such stock" (*i. e.*, stock of the kind bequeathed) "was not purchasable, and if that had been completely proved it would have been *a very strong circumstance for saying that the testator intended to give that which he then had.* It turned out that the supposition was incorrect."

In Robinson v. Addison (2 *Beav.*, 515), a testator, by his will dated in 1819, bequeathed to certain persons shares of stock in the Leeds and Liverpool Canal, aggregating in number fifteen and a half. At the date of the will, he was the owner of precisely that number of shares. He died in 1824, having disposed of the same in his lifetime. Upon the question whether the legacies were specific or general, the defendants were permitted to enter into evidence tending to show that there were infrequent sales of the shares; that they were usually held as permanent

investments; that they were not commonly brought into the market; had no market price and could not, like stock and other shares in public companies, be purchased through brokers but were generally disposed of by private arrangement. At the argument of the cause, the Master of the Rolls (Lord LANGDALE) announced as his then present impression " that neither the expressions in the will nor the difficulty in purchasing and selling the shares prevented the construction that the legacies were general." After further consideration, he said : " It was argued that the shares of this canal were so rarely brought to market that they could not be considered as transferable or purchasable for money." He then proceeded to comment upon the fact that the canal property, referred to in the bequests, was vested in a corporation, the capital of which was divided into 2600 shares, of which the testator owned only fifteen and one half, and added that " the shares though not frequently sold are nevertheless occasionally bought and sold and *may be had for money.*" The gift was construed, therefore, as a gift of " such an indefinite sum of money as would suffice to purchase as many shares as the testator had bequeathed by his will."

The state of facts with which we have here to deal is, so far as I have discovered, without any closer parallels in the reports than are to be found in the foregoing cases. And herein is the most distinguishing feature of the present situation : that, at the time when the testator was making and executing his will, it was true, as he well knew, that there were not

owned in all the world, save only by himself, as many shares of Commercial Advertiser stock as he was bequeathing to his nephews; that, from that time onward until his death, he did not part with any so held by him, and that during the interval he even acquired possession of several additional shares.   This seems to me to be utterly inconsistent with any interpretation of his will other than one. involving an intention on his part to bestow upon his nephews a portion of the very stock which he might own at his death.

When a testator, in indicating the subject of a bequest, uses words that aptly describe property which his executors find among his assets, but that are also aptly descriptive of property which they may purchase without recourse to his estate, the bequest may properly be treated as general.   But it is otherwise when the subject of the bequest is some article or thing *which the testator, and no person else, has in his possession.*   If a bequest of stock " standing in my name " or of " my " stock is specific, how can it fairly be claimed that a bequest of stock which is only procurable as the testator knows by resort to his own assets, lacks the specific quality ?   Is it not true that such words as are above quoted serve to make specific the legacy in connection with which they are used, simply and solely because the testator's directions can be fulfilled in no other way than by the transfer to the legatee of the very thing, (being parcel of the testator's estate) which is given him by the legacy.

The distinction between the facts here appearing

and those disclosed in such cases as Bronsdon v. Winter (*supra*) and Robinson v. Addison (*supra*) is well pointed out by counsel for one of these legatees. "Where the shares," he says, "are in a public company, the sources of possible supply are indefinitely numerous, but in the present case there being but one source of possible supply existent, and this source the estate of the testator," the reason of the rule applicable to ordinary cases utterly fails.

If, in Tifft v. Porter (*supra*), upon which counsel for the residuary legatee specially relies, the testator had owned substantially all the stock of the Cayuga Bank, I cannot doubt that the court would have arrived at another conclusion than the one which was there reached. If the question whether the legacies here in dispute are specific were *res integra*, I should scarcely regard it as in the least doubtful; as it is, the weight of authority is in favor of the claim of the legatees. A decree may be entered, on two days' notice, in accordance with this decision, unless, pursuant to the understanding with counsel when the case was submitted, any of the parties hereto wish in the first instance for special rulings upon offers of evidence.